Eugene TELFAIR, Plaintiff-Appellant,

v.

FIRST UNION MORTGAGE CORPORATION, Defendant-Appellee.

No. 99-10846.

United States Court of Appeals,

Eleventh Circuit.

July 7, 2000.

Appeal from the United States District Court for the Southern District of Georgia.(no. 98-00193-CV-1), William T. Moore, Jr., Judge.

Before TJOFLAT, MARCUS and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

In this review of the bankruptcy court's grant of Appellee's motion for summary judgment we consider the propriety of an attorney's fees award to an oversecured creditor in a Chapter 13 bankruptcy proceeding and determine whether Georgia law imposes fiduciary duties on a mortgagee's administration of a mortgagor's escrow fund. Finally, we review the bankruptcy court's consideration of an affidavit purportedly inconsistent with the affiant's prior testimony as well as the bankruptcy court's denial of Appellant's motion for class certification. We affirm the district court's decision affirming the bankruptcy court on all grounds.

## I. BACKGROUND AND PROCEDURAL HISTORY

Appellant Eugene Telfair and his wife obtained a Veteran's Administration (VA) guaranteed loan in 1984 from Appellee First Union Mortgage Corporation's ("First Union") predecessor-in-interest. Pursuant to a VA form Security Deed ("the Deed"), the Telfairs secured the loan with their home and agreed to make single monthly payments towards the principal and interest as well as to pay a *pro rata* share of the annual tax and insurance obligations to be placed in an escrow account.[1] First Union would make payments from

---

[1] *See* Security Deed ¶ 2, *in* BR, Part A, Tab 1, Ex. B.

this fund as they came due; any excess funds either would be refunded to the Telfairs or applied to future payments at First Union's discretion and the Telfairs would be responsible for any shortfall.[2] The Deed also provided that the Telfairs would be charged for any expenses and attorney's fees incurred by First Union in protecting the secured property, whether from default, foreclosure proceedings, or litigation.[3] Finally, the Deed obligated the Telfairs to maintain hazard insurance on their home continuously, the provider of which had to be approved by First Union. If the Telfairs failed to provide proof of such continuous coverage, the Deed authorized First Union to "force place" hazard insurance to protect its collateral.[4] First Union exercised this prerogative in 1988 when the Telfairs failed to provide proof of coverage.

On December 7, 1992, Mr. Telfair filed a Chapter 13 bankruptcy petition in which he proposed a series of payments to satisfy the existing arrearage on the First Union mortgage; the plan was confirmed on May 3, 1993. Outside of the plan, the Telfairs remained responsible for making their usual monthly mortgage payments to First Union, a responsibility that was not always met. After confirmation, First Union filed three separate motions to lift the automatic stay imposed by 11 U.S.C. § 362(a) to recover its costs incurred in attempting to recoup the defaulted payments. First Union assessed attorney's fees incurred with these motions against the Telfairs' account, which created a delinquency following the Chapter 13 payments and discharge.[5] First Union then notified the Telfairs of its intent to foreclose on the property based upon this default.

The Telfairs responded by filing a two-count complaint against First Union in the bankruptcy court asserting various violations by First Union in its assessment of attorney's fees and its forced placement of the

---

[2]*See id.* ¶ 3.

[3]*See id.* ¶ 6.

[4]*See id.* ¶ 8.

[5]Mr. Telfair and First Union dispute the nature of the funds First Union diverted to pay the attorney's fees. The bankruptcy court found that First Union had applied unspecified "post-petition payments" to pay the attorney's fees and we see no reason to delve deeper because it does not affect our disposition of this appeal.

hazard insurance. The Telfairs also sought certification of their claims for class action under Federal Rule of Civil Procedure 23. After First Union moved for summary judgment on both counts, the bankruptcy court held a class certification hearing during which it also entertained argument on the summary judgment motion. The bankruptcy court first concluded that Mrs. Telfair was not an appropriate class representative and dismissed her claim. The court then granted summary judgment to First Union on both substantive counts, rendering Mr. Telfair's request for class certification moot. The bankruptcy court also denied Mr. Telfair's motion to strike an affidavit submitted by First Union in support of its summary judgment motion. The district court affirmed the bankruptcy court on all grounds, and Mr. Telfair ("Telfair") timely appealed.

## II. DISCUSSION

In his appeal, Telfair challenges the bankruptcy and district courts' conclusions that First Union's appropriation of attorney's fees from the Telfairs' account did not implicate 11 U.S.C. § 506(b) or 11 U.S.C. § 362(a) and did not violate any fiduciary duties of First Union. We review the bankruptcy court's findings of facts for clear error and the legal conclusions of the bankruptcy and district courts *de novo. See In re Southeast Bank Corp.,* 97 F.3d 476, 478 (11th Cir.1996). Telfair also appeals the bankruptcy court's denial of his motion to strike an affidavit, which we will uphold unless it was an abuse of discretion. *See Goulah v. Ford Motor Co.,* 118 F.3d 1478, 1483 (11th Cir.1997).[6]

A.     *Attorney's Fees*

During the pendency of the Chapter 13 plan, the Telfairs defaulted on several regular loan payments. In order to recoup the costs incurred in attempting to cure these defaults, First Union filed three separate requests for attorney's fees. First Union voluntarily withdrew the first two requests in order to verify receipt of payments allegedly sent by the Telfairs. After the third filing, two money order payments could not be

---

[6]Telfair raised an assortment of other arguments before the district court and in his briefs submitted to this court, relying on such diverse provisions as Bankruptcy Rule 2016, REPSA, 12 U.S.C. § 2609, 24 C.F.R. 3500.17(b), and Ga.Code Ann. § 13-1-11. These arguments were not timely raised before the bankruptcy court, and we decline to hear them for the first time on this appeal. *See In re Daikin Miami Overseas, Inc.,* 868 F.2d 1201, 1206 (11th Cir.1989).

verified, and the bankruptcy court granted the Telfairs ninety days to trace the missing payments. The Telfairs declined to either trace or resubmit the payments. After the plan was discharged, First Union applied post-petition mortgage payments to the outstanding attorney's fees, an action which Telfair contends violated two provisions of the bankruptcy code: 11 U.S.C. § 506(b), governing costs and fees for oversecured claims,[7] and 11 U.S.C. § 362(a), the automatic stay provision.[8] Neither of these claims has merit.

### 1. Section 506

Under his Chapter 13 plan, Telfair agreed to pay supplemental payments towards the arrearage owed to First Union. After this plan was confirmed on May 3, 1993, the Telfairs made all of the required plan payments and the plan was eventually discharged on April 23, 1997. During that time, however, the Telfairs had defaulted on several of their regular loan payments due after confirmation. The attorney's fees assessed by First Union were expended in curing these defaults and thus were allowed under the terms of the Deed. Telfair does not dispute that the Deed provided for the fees taken by First Union, but asserts that First Union should have requested them as part of an amendment to the plan under section 506(b), which provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

---

[7]An oversecured claim is one for which the collateral exceeds the debt. *See In re Delta Resources, Inc.,* 54 F.3d 722, 724 n. 1 (11th Cir.1995).

[8]Before the bankruptcy and district courts, Telfair also argued that assessment of the attorney's fees violated the discharge provisions of 11 U.S.C. §§ 1328 and § 524. Section 1328 provides that upon completion of plan payments, the bankruptcy court shall discharge any debts under the plan or disallowed under section 502 except for any debt provided for under section 1322(b)(5), which allows a homeowner to cure a default through a plan up until the time of foreclosure. *See* 11 U.S.C. § 1328 (1999). Section 524 clarifies that a discharge voids any conflicting judgments on discharged debt and bars any future claim for discharged debt. *See* 11 U.S.C. § 524 (1999). The bankruptcy and district courts found these provisions inapplicable to the post-confirmation attorney's fees sought by First Union because (1) they were not provided for under the plan; (2) they were not disallowed under section 502; and (3) they would be excludable in any event under section 1322(b)(5). Telfair does not appear to challenge this aspect of the courts' conclusion on appeal as he mentions it only in passing in his initial brief. Even if he had raised this issue however, we would affirm the bankruptcy and district courts.

**4**

11 U.S.C. § 506(b) (1999). Holders of these oversecured claims are entitled, under this section, to any interest, fees, or costs provided for in the underlying debt instrument. Because First Union failed to secure an amendment to the plan before paying itself attorney's fees, Telfair contends that it removed assets from the estate in violation of the automatic stay.

The district court affirmed the bankruptcy court's conclusion that section 506(b) only governs fee petitions until the time of confirmation. Because the attorney's fees incurred by First Union arose from its attempts to cure post-confirmation defaults, the bankruptcy and district courts determined that the terms of the Deed, without reference to section 506(b), governed the award of fees. The Deed expressly provided for the attorney's fees assessed by First Union against Telfair.

In considering an oversecured creditor's claim for interest, the Supreme Court has stated that interest accrues under section 506(b) "as part of the allowed claim from the petition date until the confirmation or effective date of the plan." *Rake v. Wade,* 508 U.S. 464, 471, 113 S.Ct. 2187, 2191, 124 L.Ed.2d 424 (1993).[9] The fact that the parties in *Rake* agreed that section 506(b) only applied in the post-petition, pre-confirmation period does not undermine the imperative effect of the Court's decision, and this court has recognized as such. *See In re Delta Resources, Inc.,* 54 F.3d 722, 727 (11th Cir.1995); *see also* 4 Collier on Bankruptcy ¶ 506.04[2] (Lawrence P. King et al. eds., 15th ed. 2000) ("Section 506(b) ... has no application to a secured creditor's entitlement to post-confirmation interest....").

Telfair relies on a pre-*Rake* decision for the proposition that a mortgagee should not divert maintenance payments to pay for attorney's fees without court approval. *See In re Rathe,* 114 B.R. 253 (Bankr.D.Idaho 1990). The creditor in *Rathe,* however, sought to include attorney's fees as part of its secured claim, and could only do so under section 506(b). *See id.* at 256. To the extent that the reasoning of *In re Rathe* is inconsistent with the intervening *Rake* decision, it has been overruled.

---

[9] *Rake* was overruled by statute on other grounds, but the new legislation did not affect agreements entered into before October 22, 1994 and so would not affect our disposition of this case in any event. *See In re Smith,* 85 F.3d 1555, 1558 n. 3 (11th Cir.1996).

Telfair next seeks to distinguish *Rake* on the ground that it involved interest accruing on claims prior to confirmation and only in dictum suggested that its holding would apply to attorney's fees. This court, however, can find no basis to distinguish *Rake* 's statement that section 506(b) "applies only from the date of filing through the confirmation date," 508 U.S. at 468, 113 S.Ct. at 2190, on the ground that it dealt with interest rather than attorney's fees. *Cf. In re Harko,* 211 B.R. 116, 119 (2d Cir.BAP 1997) ("There is nothing in the language of § 506(b) to suggest that interest, as opposed to fees, costs and charges, should be treated any differently and the majority of courts have so held."). Indeed, a contrary result would be inconsistent with the purpose of section 506(b), which allows oversecured creditors to include post-petition interest and certain fees as part of the secured claim they will receive upon confirmation of the plan. *See In re Delta Resources,* 54 F.3d at 729. In this case, the attorney's fees that First Union sought were not part of its secured claim; they arose apart from the plan and after confirmation.

Telfair's final argument is that the mutable nature of a Chapter 13 proceeding even after confirmation counsels in favor of bankruptcy courts using section 506(b) to maintain their control over post-confirmation awards of attorney's fees. Telfair suggests that without this instrument, "secured creditors in Chapter 13 cases are going to run amok" following confirmation.[10] We appreciate Telfair's concern, but are satisfied that the terms of debt instruments agreed to by debtors and creditors provide adequate protection for Chapter 13 debtors.[11]

### 2. Section 362(a)

Pursuant to section 362(a), the filing of a bankruptcy petition acts as an automatic stay against actions or claims against the property of the bankruptcy estate. *See* 11 U.S.C. § 362(a) (1999).[12] Telfair

---

[10]Appellant's Br. at 32.

[11]Section 1322, which also governs post-confirmation awards of interest or fees, provides further protection to homeowners and homestead lenders. *See* 11 U.S.C. § 1322 (1999).

[12]The relevant portion of section 362(a) reads:

contends that First Union's diversion of payments to recover attorney's fees ran afoul of the stay provision because the funds were property of his bankruptcy estate. Central to our consideration of this contention is a determination of what constitutes property of the estate following confirmation of a bankruptcy plan. According to section 1306:

> (a) Property of the estate includes, in addition to the property specified in section 541 of this title—
>
> . . .
>
>> (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first.
>
> (b) Except as provided in a confirmed plan or order confirming a plan, the debtor shall remain in possession of all property of the estate.

11 U.S.C. § 1306 (1999). A later section of the code provides that "[e]xcept as otherwise provided in the plan or order confirming the plan, the confirmation of the plan vests all of the property of the estate in the debtor." 11 U.S.C. § 1327(b) (1999). Read together, these two provisions create a tension to the extent they govern the debtor's post-confirmation earnings: section 362 appears to protect those earnings while section 1327(b) would vest those same earnings in the debtor, thereby divesting them of the protection of section 362(a).

In resolving this conflict, courts have adopted one of three models: the estate termination approach, the estate preservation approach, and the estate transformation approach. Under the estate termination

---

> [A] petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of—
>
> . . .
>
>> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
>> (4) any act to create, prefect, or enforce any lien against property of the estate;
>
> . . . .

11 U.S.C. § 362(a) (1999).

approach, all property of the estate becomes property of the debtor upon confirmation and ceases to be property of the estate. *See In re Petruccelli,* 113 B.R. 5, 15 (Bankr.S.D.Cal.1990). According to the estate preservation approach, all property of the estate remains property of the estate after confirmation until discharge, dismissal, or conversion. *See In re Kolenda,* 212 B.R. 851, 853 (W.D.Mich.1997). A compromise between these two extremes is struck by the estate transformation approach, which regards only that property necessary for the execution of the plan as remaining property of the estate after confirmation. *See In re Heath,* 115 F.3d 521, 524 (7th Cir.1997); *In re McKnight,* 136 B.R. 891, 894 (Bankr.S.D.Ga.1992).

Urging this court to adopt the estate preservation approach, Telfair raises the specter of unscrupulous debtors "free to do whatever they please with their property when it is revested in them."[13] Telfair presents a fair challenge to the estate termination approach, which does not protect the post-confirmation obligations of the bankruptcy plan. The estate transformation approach, however, protects the interests of both the debtor and the creditors.

Consideration of the case law and the general concerns of the bankruptcy code assures us that the estate transformation approach, adopted by the bankruptcy courts in the Southern District of Georgia, should be the law of this circuit. We therefore echo the conclusion of the Seventh Circuit and "read the two sections, 1306(a)(2) and 1327(b), to mean simply that while the filing of the petition for bankruptcy places all the property of the debtor in the control of the bankruptcy court, the plan upon confirmation returns so much of that property to the debtor's control as is not necessary to the fulfillment of the plan." *In re Heath,* 115 F.3d at 524. In this case, after confirmation, only the amount required for the plan payments remained property of the estate. Telfair's regular loan payments, made outside of the plan, were therefore no longer property

---

[13]Appellant's Br. at 36.

of the estate and First Union's application of a portion of those payments to attorney's fees pursuant to the Deed did not violate section 362(a).[14]

B.      *Forced Insurance*

Under the terms of the Deed, the Telfairs were required to maintain hazard insurance on their home, with a provision allowing First Union to "force place" hazard insurance if the Telfairs let their coverage lapse. In 1988, the Telfairs failed to provide proof of coverage and First Union exercised its prerogative to "force place" insurance on the secured property. Rather than obtaining a policy with the Telfair's previous insurance company, First Union arranged for coverage by Transamerica Premier Insurance Company and then, a year later, by Balboa Insurance Company ("Balboa"), both which charged substantially higher premiums and paid considerable commissions to First Union.[15] First Union paid for these premiums with funds from the Telfairs' escrow account. Telfair contends that this arrangement violated First Union's fiduciary duties arising from either its administration of the Telfairs' escrow account as a trust or its role as the Telfairs' agent.

As evidence that the escrow account was an enforceable trust or obligated First Union as their agent, Telfair cites the Deed's requirement that he and his wife "pay to [First Union] as trustee (under the terms of this trust as hereinafter stated)"[16] tax and insurance payments that First Union would pay as they came due. Unpersuaded by this semantic argument, the bankruptcy court concluded, and the district court agreed, that, under Georgia law, a mortgagee's administration of an escrow account gives rise to neither a trust nor an agency relationship.

---

[14]Even if First Union technically applied plan payments to attorney's fees and then applied a regular loan payment towards the plan payments, our conclusion would not be different because, ultimately, all the plan payments were properly applied, as evidenced by the bankruptcy court's discharge of Telfair's plan.

[15]Telfair attributes a nefarious purpose to First Union's arrangement with Balboa; the change in coverage, however, was prompted by the Telfairs' own lapse and, according to First Union, discontinuation of coverage in Georgia by the Telfairs' previous carrier. In addition, although First Union alerted the Telfairs to the higher rates, the Telfairs did not secure replacement insurance until 1998, ten years after the initial lapse.

[16]Security Deed, ¶ 2, *in* BR, Part A, Tab 1, Ex. B.

A trust born under Georgia law may be either express or implied. An express trust must be in writing and "shall have each of the following elements, ascertainable with reasonable certainty: (1) An intention by the settler to create a trust; (2) Trust property; (3) A beneficiary; (4) A trustee; and (5) Active duties imposed on the trustee, which duties may be specified in writing or implied by law." Ga.Code Ann. § 53-12-20 (1997). An implied constructive trust, as claimed by the Telfairs, is found "whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity." *Id.* § 53-12-93(a).

As correctly found by the bankruptcy and district courts, there is no evidence that either type of trust was formed because there is no indication that the Telfairs and First Union intended the escrow funds to comprise a trust corpus. Rather, First Union's retention of future tax and insurance payments inured to the benefit of both parties in protecting the secured property.[17] *See Moore v. Bank of Fitzgerald,* 225 Ga.App. 122, 483 S.E.2d 135, 139 (1997) ("[A]bsent special circumstances ... there is ... no confidential relationship between lender and borrower or mortgagee and mortgagor for they are creditor and debtor with clearly opposite interests.") (internal quotation marks and citation omitted). Although the Deed used the word "trust," the Georgia Court of Appeals has noted that

> [t]he majority rule appears to be that funds paid by a mortgagor to an escrow account to be used by the mortgagee to meet tax and insurance obligations ... do not constitute trust properties such as would render the mortgagee accountable to the mortgagor for any earnings or profits from the funds.

*Knight v. First Fed. Sav. & Loan Ass'n,* 151 Ga.App. 447, 260 S.E.2d 511, 515 (1979). This observation is in accord with the case law. *See* Ferdinand S. Tinio, Annotation, *Rights in funds representing "escrow" payments made by mortgagor in advance to cover taxes or insurance,* 50 A.L.R.3d 697 § 3 (1973); *see also*

---

[17]Telfair's citation to First Union employee's deposition testimony that the funds in the escrow accounts belong to the customers, *see* BR, Part J, Tab 111 at 20 (Pam Swallow Dep.), is unavailing. Although this testimony may have enlightened the bankruptcy court's consideration of whether, as a matter of Georgia law, the escrow funds comprised an enforceable trust, the bankruptcy court was not bound by it in reaching its ultimate conclusion.

*Judd v. First Fed. Sav. & Loan Ass'n,* 710 F.2d 1237, 1241 (7th Cir.1983) (mere use of trust terminology in a VA form security deed does not create a fiduciary duty).

*Liberty National Life Insurance Co. v. United States,* 463 F.2d 1027 (5th Cir.1972), relied on by Telfair, is not to the contrary.[18] In *Liberty National,* the former Fifth Circuit concluded that a mortgagor's escrow funds created a trust asset of the mortgagee bank for federal income tax purposes. *See* 463 F.2d at 1029-30. Not only was this opinion decided on federal rather than state law, but the narrowness of its holding was recognized by this court five years later when it concluded that, for other tax purposes, mortgage escrow funds created "a contractual obligation and nothing more." *Southwestern Life Ins. Co. v. United States,* 560 F.2d 627, 634 (5th Cir.1977).

The same reasoning compels the conclusion that First Union's administration of the Telfairs' escrow account did not thrust on them the role of agent. Under Georgia law, agency results from the manifestation of mutual consent that one person will act on the other's behalf and subject to the other's control. *See Smith v. Merck,* 206 Ga. 361, 57 S.E.2d 326, 332 (1950). In the case of escrow funds held by a mortgagee for payment of tax and insurance payments on behalf of a mortgagor pursuant to a security agreement, the mortgagee does not act as agent because the mortgagee acts neither for the sole benefit of the mortgagor nor under the mortgagor's control. *See Georgia Farm Bureau Mut. Ins. Co. v. First Fed. Sav. & Loan Ass'n,* 152 Ga.App. 16, 262 S.E.2d 147, 150 (1979) (a mortgagee does not act as the agent of its mortgagor when it sought insurance for the secured property). Here, for example, although the terms of the Deed constrain First Union's use of the escrow funds, any insurance obtained with those funds had to meet First Union's approval, and the Telfairs lacked the authority to either direct the use of the escrowed funds or to terminate First Union's control thereof. We therefore affirm the conclusion of the bankruptcy and district courts that administration

---

[18]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

of escrow funds such as the one here, without more, does not create an agency relationship under Georgia law.

C.      *The De Gorter Affidavit*

Telfair contends error in the bankruptcy court's consideration of an affidavit submitted by First Union. The affidavit of David de Gorter, Balboa's former Assistant Vice President for Marketing, describes Balboa's insurance product. Because de Gorter had professed ignorance of many specifics of the product during his previous deposition, Telfair maintains that the subsequent inconsistent affidavit should have been stricken as a "sham." *See Van T. Junkins & Assocs. v. U.S. Indus.,* 736 F.2d 656, 656 (11th Cir.1984) ("[A] district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation."). The bankruptcy court, however, accepted First Union's explanation of the disparity: that de Gorter had informed himself of the insurance policy's terms in the interval between his deposition and affidavit. This is a valid explanation, and we cannot say that its acceptance by the bankruptcy and district courts was an abuse of discretion. In any event, de Gorter's familiarity was based only on other materials in the record, so it is difficult to see whence any prejudice would have come.

D.      *Class Certification*

After determining that none of Telfair's underlying claims had merit, the bankruptcy court came to the ineluctable conclusion that there were no claims to certify as a class action lawsuit.[19] It was within the court's discretion to consider the merits of the claims before their amenability to class certification. *See Cowen v. Bank United of Texas,* 70 F.3d 937, 941 (7th Cir.1995); *Wright v. Schock,* 742 F.2d 541, 543-44 (9th Cir.1984); *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 758 (3d Cir.1974) (en banc). With no meritorious claims, certification of those claims as a class action is moot. Because we agree with the

---

[19]The bankruptcy court also denied Mrs. Telfair's motion for class certification on the ground that her claims were not sufficiently representative, but she does not appeal this decision.

bankruptcy and district courts' disposition of the merits of Telfair's claims, we also affirm the denial of the motion for class certification.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision affirming the bankruptcy court in all respects.