**In re Edner and Marie DOMINIQUE,
Chapter 13 Debtors.**

No. 02–50776–BKC–LMI.

United States Bankruptcy Court,
S.D. Florida.

May 14, 2007.

Laila S. Gonzalez, Esq., Hialeah, FL, for Debtors.

### ORDER GRANTING IN PART AND DE-NYING IN PART DEBTORS' MO-TION TO DETERMINE POST–PE-TITION ESCROW INCREASES DISCHARGEABLE

LAUREL M. ISICOFF, Bankruptcy Judge.

This matter came before the Court on February 1, 2007, and then again on April 5, 2007, on the Debtors' Motion to Determine Post Petition Escrow Increases Dischargeable (CP # 63). I have considered the Motion, and the memoranda of law filed by the Debtors and Countrywide (CP ## 73 and 76, respectively), the argument of counsel, as well as applicable law, and for the reasons set forth below grant in part and deny in part the Motion because Countrywide failed to provide notice of escrow deficiencies as required by applicable law and therefore has waived all post-petition escrow increases other than those for the current year.

### FACTUAL AND PROCEDURAL BACKGROUND

Countrywide is the holder of a Mortgage and Note dated on or about April 19, 1999. The Note is in the principal amount of $89,268.00 and executed by the Debtors, Edner Dominique and Marie T. Dominique. The Mortgage encumbers the Debtors' home located in Miami–Dade County, Florida (the "Home"), and secures repayment of the Note.

The Debtors filed a chapter 13 bankruptcy petition on August 26, 2002. Countrywide filed a proof of claim on September 30, 2002. The Debtors filed their chapter 13 plan on September 24, 2002. Pursuant to that plan, the Debtors have been paying Countrywide monthly a scheduled payment amount listed in the plan for ongoing debt service together with a separate monthly amount necessary to cure any pre-petition arrearages owed to Countrywide in accordance with the proof of claim filed by Countrywide. The payments under the chapter 13 plan are scheduled to be completed in August of 2007.

On November 20, 2006, Countrywide provided to the Debtors an escrow account review citing an arrearage of $6,397.45 (the "Escrow Shortage"). The Mortgage requires the Debtors to pay monthly principal and interest due under the Note, any late charges, and an allocable portion of taxes, special assessments, if any, and in-

surance premiums. The Mortgage provides that "[i]f the amount of funds held by Lender at any time is not sufficient to pay the Escrow Items [which, under the terms of the Mortgage, include taxes and insurance] when due, Lender may notify the Borrower and require Borrower to make up the shortage as permitted by RESPA." The record is not clear for what periods the Escrow Shortage is owing,[1] but it is undisputed that it is an arrearage that has accrued post-petition over the past several years. It is also not disputed that the November, 2006 notice is the first written notice that Countrywide provided to the Debtors with respect to any shortfalls or deficiencies in the escrow payments required under the Mortgage.

Upon receipt of the notice, the Debtors filed a First Modified Plan (CP # 60) that modifies the payments to Countrywide to pay the increased escrow payments and adjustments associated with the current escrow year.[2] The Debtors also filed the Motion, seeking a ruling that the Escrow Shortage will be discharged upon plan completion, as Countrywide is estopped from asserting those arrearages now, having never objected to the original chapter 13 plan and having always accepted monthly payments consistent with the listed plan amounts.

Countrywide counters that it is not estopped from seeking payment of those arrearages now, that the Escrow Shortage will not be discharged upon completion of the Debtors' chapter 13 plan payments,

and that, even if the Debtors are not required to repay the Escrow Shortage now, the obligation will continue to be secured by the Home.

The resolution of this dispute requires consideration first, of Countrywide's obligation to provide notice of escrow deficiencies; second, if Countrywide has such an obligation, was that obligation excused; and third, if not excused, what are the consequences of the failure to provide notice.

## COUNTRYWIDE HAD AN OBLIGATION TO PROVIDE NOTICE OF ESCROW SHORTAGES AND FAILED TO DO SO

Both federal and Florida law impose unambiguous obligations on a loan servicer (which can be the lender) to advise a borrower when an escrow account is deficient.[3]

### a. Federal Law

■ The Real Estate Settlement and Procedures Act, 12 U.S.C. §§ 2601, et seq. ("RESPA"), imposes a variety of obligations on lenders that are subject of its provisions. 24 C.F.R. § 3500.1 et seq., implements those requirements and more fully details procedures to satisfy those requirements.

12 U.S.C. § 2609(b) provides

(b) Notification of shortage in escrow account

---

1. It appears, based on an attachment to Countrywide's Memorandum of Law, that the arrearages are for the years 2002 through 2005.

2. It is not clear whether the payments under the modified plan include repayment of escrow shortages or deficiencies for the current computation period. Nothing in this opinion is intended to alter the Debtors' obligations, if any, with respect to payments for the current

escrow account computation year to the extent calculated and assessed in accordance with the provisions of 24 C.F.R. § 3500.17(f), Fla. Stat. § 501.137(2), and the Mortgage.

3. RESPA does not generally preempt state law, and does not preempt state law for purposes of the notice requirements for deficient escrow accounts. See 12 U.S.C. § 2616 and 24 C.F.R. § 3500.13.

If the terms of any federally related mortgage loan require the borrower to make payments to the servicer (as the term is defined in section 2605(i) of this title) of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall notify the borrower not less than annually of any shortage of funds in the escrow account.

There is no dispute that Countrywide is subject to the provisions of RESPA.

Countrywide takes the position that it was exempt from providing notice of the payment changes to the Debtors because, pursuant to 24 C.F.R. § 3500.17(i)(2), a loan servicer is not obligated to provide a borrower with annual statements otherwise required by RESPA "where the borrower is in bankruptcy proceedings." Countrywide accurately recites this regulation but overlooks that the exemption only applies to providing the annual statement required by 24 C.F.R. § 3500.17(i)(1).[4] 24 C.F.R. § 3500.17(c) requires that in each instance where a borrower is required to escrow funds with a lender for the payment of charges such as taxes and insurance, the loan servicer "must conduct an escrow account analysis at the completion of the escrow account computation year[5] to determine the borrower's monthly escrow account payments for the next computation year." 24 C.F.R. § 3500.17(c)(3). The servicer must advise a borrower of any shortfall or deficiency, 24 C.F.R. § 3500.17(f)(5), and the servicer may, when there is a shortfall or deficiency, require the borrower to pay additional deposits

into the escrow account to make up the shortfall or deficiency, subject to certain limitations. However, the servicer is not required to seek the additional deposits from the borrower. *See* 24 C.F.R. § 3500.17(c)(1)(ii).

In virtual repetition, 24 C.F.R. § 3500.17(f), the subsection that specifically addresses shortages, surpluses and deficiencies in escrow accounts, unequivocally requires a servicer to conduct an escrow account analysis annually "to determine whether a surplus, shortage or deficiency exists." Where there is a shortfall or deficiency, depending on the amount involved, the regulations authorize the servicer to seek repayment or to allow the shortage or deficiency to exist and "do nothing to change it." 24 C.F.R. §§ 3500.17(f)(3) and (f)(4). Finally, 24 C.F.R. § 3500.17(f)(5) requires the servicer to notify the borrower "at least once during the escrow account computation year if there is a shortage or deficiency in the escrow account. The notice may be part of the annual escrow account statement or it may be a separate document." In sum, the federal statute and the regulations implementing the statute unambiguously and unequivocally impose upon a loan servicer the obligation to do an escrow analysis annually and to provide a borrower with notice, no less than annually, of any shortfall or deficiency.

#### b. *Florida Law*

Florida law also imposes a time deadline for notice of a deficient escrow account. Florida law requires

(2) If an escrow account for the taxes or insurance premiums is deficient, the

---

**4.** The annual escrow statement includes an escrow account history, as well as a projection of the escrow account activity for the upcoming year. 24 C.F.R. § 3500.17(i).

**5.** Escrow Account Computation Year is defined as "a 12–month period that a servicer

establishes for the escrow account beginning with the borrower's initial payment. The term includes each 12–month period thereafter, unless a servicer chooses to issue a short year statement...." 24 C.F.R. § 3500.17(b).

lender shall notify the property owner within 15 days after the lender receives the notification of taxes due from the county tax collector or receives the notification from the insurer that a premium is due.

Fla. Stat. § 501.137(2). There are no exceptions to this requirement.

### c. Notice of All Shortages and Deficiencies was Not Given

██ As previously noted, Countrywide did provide notice of the escrow shortfalls to the Debtors on November 20, 2006. However, Countrywide did not provide notice to the Debtors prior to November 20, 2006, notwithstanding the shortfalls Countrywide seeks to recoup stem from a period of several years. Countrywide argues that the Debtors had effective notice of the increased costs because the Debtors actually changed their insurance company and knew the premiums were increased, and the Debtors received notices of taxes each year. Neither of these facts, even if true, provide an exemption to Countrywide of its obligations under federal and Florida law to do the escrow analysis and to provide the notice of shortfalls or deficiencies. Furthermore, as pointed out by the Debtors' counsel, unsophisticated lay people cannot be expected to understand how a notice of tax increase or a change in insurance carrier will translate to increased escrow payment obligations. Indeed, changes in expense do not necessarily change a borrower's payment obligation, since as noted above, a lender is not required to demand payment. Finally, any notice from Countrywide to the Debtors must comply with the Mortgage, which requires that "[a]ny notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method." Accordingly, I find that the only notice provided by Countrywide to Debtors was the November 20, 2006 notice.

### THE AUTOMATIC STAY DID NOT PROHIBIT COUNTRYWIDE FROM PROVIDING THE NOTICE

██ Countrywide argues that it was excused from giving notice because it was prevented from doing so by the automatic stay. However, Countrywide has not cited any section of the Bankruptcy Code that provides that a notice of shortfall or deficiency in an escrow account is a violation of the automatic stay. Regardless of whether making an actual request for payment of an escrow deficiency is a stay violation, merely providing notice of an escrow deficiency is not a stay violation. *See Chase Manhattan Mortgage Corp. v. Padgett*, 268 B.R. 309 (S.D.Fla.2001). *Cf. In re Draper*, 237 B.R. 502 (Bankr.M.D.Fla.1999)(invoices purportedly provided for "informational purposes only" violated stay because the invoices clearly sought payment). Moreover, if the automatic stay was truly of concern to Countrywide, Countrywide could have filed a motion for stay relief to authorize providing the required notice or billing the Debtors the increased payment amount.

### THE CONSEQUENCE OF NON–COMPLIANCE

██ Having determined that Countrywide failed to comply with federal or Florida law, and was not excused from doing so, the ultimate question then is, what is the effect of this failure? The Debtors seek an order of this Court finding that the Escrow Shortage will be discharged when the Debtors complete their plan payments in August. Countrywide seeks an order requiring the Debtors to modify the plan so that the Escrow Shortage will be paid in full through the remaining plan payments. The Debtors contend, and Countrywide

does not dispute, that such an outcome would derail the plan.

A resolution of this issue lies in non-bankruptcy law, since, as noted previously, these payment obligations arose after the Debtors filed bankruptcy, and indeed, apparently after the Debtors' original chapter 13 plan was confirmed. Nevertheless, it is important to understand the applicable Bankruptcy Code provisions, as well as bankruptcy decisions that have addressed payment changes, the collection of arrearages and pre-confirmation and post-confirmation charges, because it is only by understanding these decisions that it becomes clear that resolution of this issue lies outside the Bankruptcy Code.

### a. *The Chapter 13 Plan, Discharge and Res Judicata*

Chapter 13 permits debtors to readjust their secured obligations, including, in certain instances, to reduce an interest charge, reduce the secured amount of a claim to the value of the collateral securing the claim, which, in certain cases, renders the claim entirely unsecured, and to stretch out payments. *See generally* 11 U.S.C. § 1322(b)(2), (b)(3) and (b)(5), and 11 U.S.C. § 1325(d); *see also* 11 U.S.C. § 506. However, when an obligation is secured solely by the debtor's primary residence, a debtor may not modify the rights of the holder of such claim. 11 U.S.C. § 1322(b)(2).[6] "Rights of the holder of such claim" include all rights arising under applicable debt instruments and security interests.

They include the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioner's residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure ... These are the rights that were "bargained for by the mortgagor and the mortgagee" ... and are rights protected from modification by § 1322(b)(2).

*Nobelman v. American Savings Bank,* 508 U.S. 324, 329–330, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (citations omitted).

Notwithstanding subsection 1322(b)(2), a chapter 13 plan may cure prepetition defaults under a mortgage. 11 U.S.C. § 1322(b)(5).[7] Indeed, it is this provision of the Bankruptcy Code that, at least pre-BAPCPA,[8] propelled many debtors to seek relief under chapter 13; it was the only way they could save their homes following a mortgage default.

In addition to sections 1322 and 1325, other Bankruptcy Code sections have a bearing on this issue. The first is 11 U.S.C. § 1328, the discharge provision. Section 1328 provides that after a chapter 13 debtor has completed all payments under the plan, "the court shall grant the debtor a discharge of all debts provided for by the plan...." An exception to the discharge is the section 1322(b)(5) cure obligations.

The second is 11 U.S.C. § 1327(a) which provides that every creditor of the debtor, as well as the debtor, is bound by the provisions of the plan. The plan is res

---

6. 11 U.S.C. § 1322(b)(2) provides that a chapter 13 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims."

7. A debtor can also use a chapter 13 plan to cure post-petition defaults. *See Green Tree Acceptance, Inc. v. Hoggle (In re Hoggle),* 12 F.3d 1008 (11th Cir.1994).

8. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

judicata as to all matters addressed by the Plan.

### b. *Payments Under a Plan and Beyond*

Thus, in a chapter 13 plan, obligations owed to a lender whose debt is secured only by the debtor's primary residence can be divided into the arrearage claim and the ongoing payments under the debt instruments. *See Universal American Mtg. Co. v. Bateman (In re Bateman),* 331 F.3d 821, 826, n. 5 (11th Cir.2003). The payment of each of these obligations can then be made through the chapter 13 plan.[9] However, these obligations cannot be modified through the plan, and any attempt at modification inconsistent with the Bankruptcy Code will not result in discharge of the obligation.

In *In re Bateman,* relied upon by Countrywide, the Eleventh Circuit held that, notwithstanding confirmation of a chapter 13 plan that had an incorrect arrearages amount to which plan the secured lender raised no objection, the plan was not res judicata as to the arrearages amount required to cure the prepetition deficiency under the mortgage. The court held that section 1327 could not be used to impermissibly modify a home loan protected by the provisions of section 1322(b)(2) or to object to a claim inconsistent with the requirements of Bankruptcy Rule 3007. Since the plan in *Bateman* was improperly confirmed, the plan had no res judicata effect on the lender's cure claim. Consequently, the court held that the unpaid balance of the cure obligation was not discharged and continued to be secured by the debtor's residence.

There is, arguably, a third category of payments between a borrower and home lender under a chapter 13 plan—those payment obligations that arise post-confirmation by virtue of changes in the interest rate or changes in escrow obligations, or fees, costs and late charges that arise due to post-confirmation defaults.

While there is a continuing debate outside the Eleventh Circuit regarding the treatment of these obligations,[10] it appears this debate is settled in this circuit. In *In re Guevara,* 258 B.R. 59 (Bankr.S.D.Fla. 2001), the debtors' chapter 13 plan proposed to cure certain prepetition arrearages owed to their home lender, and to make monthly payments on the debt service and escrow in accordance with the mortgage. Each year the tax and insurance escrow amounts changed, and the lender provided notice to the debtors of such changes. The debtors did not change the monthly payments to the lender and the lender did not attempt to collect the deficiencies. When the chapter 13 plan payments were completed the lender sought payment of the deficiencies. The debtors sought an order of the court holding the deficiencies were discharged. The bankruptcy court held that post-confirmation payment changes were not "provided for by the plan" and therefore, the plan was not res judicata as to the payment of these obligations, nor were these obligations discharged. 258 B.R. at 61. Finally, the court noted that the mortgage documents themselves authorized and contemplated payment of annual shortfalls, thus any attempt to use a chapter 13 plan to modify that obligation would be impermissible under 11 U.S.C. § 1322(b)(2). *Id.* at 61. *See also Telfair v. First Union Mortgage Corp.,* 224 B.R. 243 (Bankr.S.D.Ga.19968), *aff'd* 216 F.3d 1333 (11th Cir.2000), *cert.*

---

**9.** Some debtors pay the ongoing monthly debt service outside the plan. There is debate as to the allowability or advisability of this approach. *See generally In re Perez,* 339 B.R. 385 (Bankr.S.D.Tex.2006).

**10.** *See, e.g., In re Perez, supra* note 9; *In re Padilla,* 365 B.R. 492 (Bankr.E.D.Pa.2007).

*denied* 531 U.S. 1073, 121 S.Ct. 765, 148 L.Ed.2d 666 (2001)(*"Telfair I"*). (The bankruptcy court held that post-petition post-confirmation payments arising under a mortgage were not payments provided for under the plan, and were not discharged when the plan was confirmed).

In *Telfair v. First Union Mortgage Corp.*, 216 F.3d 1333 (11th Cir.2000), the circuit court affirmed the lower court's rulings that 11 U.S.C. § 506(b) does not apply to attorney fees and costs arising after confirmation of a chapter 13 plan due to post-confirmation defaults, and therefore, a lender's payment of fees from post-confirmation payments was not limited by section 506(b). The circuit court upheld the bankruptcy court's conclusion that payment obligations arising post-confirmation were not subject of section 506(b) limitations because section 506(b) only applies to a bankruptcy claim and post-petition fees do not constitute part of the lender's bankruptcy claim.

Similarly, whether or not addressed in a chapter 13 plan, obligations under a debt instrument that arise post-petition are not part of a bankruptcy "claim." While a chapter 13 plan can certainly state what is the initial monthly debt service obligation to a lender, in most mortgages those payments will change, either due to interest adjustments, if the loan has an adjustable interest rate, or due to changes in the escrow requirements. Since the Bankruptcy Code prohibits a debtor from using a chapter 13 plan to modify its obligations to a home lender protected by 11 U.S.C. § 1322(b)(2), it follows that, with respect to ongoing debt service obligations, those rights cannot be altered by the chapter 13 plan. However, this does not mean such a lender's rights cannot be altered by other means.

### c. *Countrywide's Right to Payment*

Countrywide, citing *Guevara* and *Bateman*, contends that it is entitled to full payment of the Escrow Shortage. If *Guevara* is applicable, the Debtors would be required to modify their plan to satisfy the Escrow Shortage. If *Bateman* is applicable, modification of the Debtors' plan would not be required, but Countrywide would retain its lien and right to payment despite the Debtors' discharge. However, neither *Guevara* nor *Bateman* is dispositive of the issue before me. *Bateman* addresses the res judicata effect of a confirmed plan on a pre-petition debt. There is no question, however, that the Escrow Shortage is not a pre-petition debt. Moreover, even if I disagree with *Telfair I* and *Guevara* that the Escrow Shortage is not a payment, or associated with a payment, "provided for by the plan," section 1322(b)(2) prohibits alteration of a creditor's rights secured solely by the primary residence. If the Mortgage allows payment changes, then nothing in a chapter 13 plan can alter that right. Since my holding is not dependent on the Debtors' treatment of Countrywide's claims under the plan, *Bateman* is inapplicable. *Guevara* is likewise inapplicable, because the *Guevara* lender complied with the notice provisions of RESPA and Florida law.

The issue presented by these facts is what are the consequences to Countrywide of its failure to comply with the notice requirements of RESPA and Florida law. This is exactly the issue addressed by the district court in *Padgett*. I find the reasoning of *Padgett* persuasive.[11]

11. While there is a debate whether a bankruptcy court is bound by the holdings of a district court, *compare Health Services Credit Union v. Shunnarah (In re Shunnarah)*, 273 B.R. 671 (M.D.Fla.2001)(finding bankruptcy courts are "inferior" and bound by published district court opinions, unless an opinion that contains a different holding is published) *with In re Romano*, 350 B.R. 276 (Bankr.E.D.La.2005)(holding a single deci-

In *Padgett*, the district court upheld the bankruptcy court's holding that the lender, Chase, had waived its right to recover post-confirmation advances for taxes and insurance because Chase had never notified the debtors of the need to increase monthly payments. The district court rejected Chase's argument that 11 U.S.C. § 1322(b)(2) prohibited any alteration of its lien rights. The district court held that Chase had failed to meet its obligations as a mortgagee to comply with RESPA and Florida notice requirements, and the consequence of that failure was waiver of the right to collect the shortfalls to which the failure to give notice related.

Waiver of reimbursement is a logical consequence of failure to give notice, and although the consequence of waiver is not definitively stated as a remedy for a lender's failure to provide an annual escrow analysis and notice of shortfall, the holding of the *Padgett*[12] court is not inconsistent with applicable law or the Mortgage. The Mortgage requires notice and a shortfall demand in accordance with RESPA. As noted above, the mandate of both RESPA and the Code of Federal Regulations is clear. The servicer must do an annual analysis and must provide an annual statement. 24 C.F.R. § 3500.17(b), referencing § 3500.17(f) states "if a servicer advances funds for a borrower, then the servicer must perform an escrow account analysis before seeking repayment of the deficiency." Once the annual determination of a shortfall or deficiency is made, any adjustment, should the servicer choose to seek an adjustment, must be made in accordance with 24 C.F.R. § 3500.17(f). However, there is no option to adjust the escrow to account for a shortfall or deficiency unless the annual

analysis is completed and the annual notice provided.

■ Although the Florida statute does not specifically provide waiver as a consequence of failure of a loan servicer to provide timely notice of an escrow deficiency to a borrower, there is nothing in the statute that modifies Florida law regarding waiver. Florida law recognizes that a lender can waive or modify its rights under a written instrument. *See CJ Restaurant Enterprises, Inc. v. FMS Mgmt. Sys. Inc.*, 699 So.2d 252 (Fla. 3d DCA 1997); *see also Smith v. Landy*, 402 So.2d 441 (Fla. 3d DCA 1981). Since Countrywide did not provide notice as required by the law and by Mortgage, the right to payment is waived.

Since Countrywide failed to meet the conditions precedent to seeking payment, and since that failure cannot be cured (the annual or fifteen day periods in question having passed), Countrywide is not entitled to seek the payment of the Escrow Shortage, other than for the current escrow account computation year, which the Debtors have already agreed to pay, and, indeed, have started to pay.

### CONCLUSION

A debtor cannot use a chapter 13 plan to alter the rights of a lender whose debt is secured solely by the debtor's primary residence. Conversely, a lender cannot hide behind a borrower's bankruptcy to avoid complying with its own obligations associated with those rights. Countrywide failed to comply with its regulatory and contractual obligations—the consequence

---

sion of a district court in a multi-judge district is not binding upon a bankruptcy court in the district), I do not need to make that decision here since I have decided to adopt the reason-

ing of the *Padgett* court, whether or not I am otherwise bound by that court's holding.

**12.** *Padgett* is the only case this Court has been able to find that addresses this issue.

is a waiver of its rights associated with that failure. It is therefore ORDERED AND ADJUDGED as follows—

a. Countrywide has waived its right to payment of deficiencies or shortfalls that have accrued prior to the current escrow account computation year; and

b. Countrywide may not collect or retain a lien on the Home with respect to any portion of the Escrow Shortage other than that associated with the current escrow account computation year.