### In re NUCENTRIX BROADBAND NETWORKS, INC., et al., a/k/a Heartland Wireless Communications, Inc.

### No. 03–39123HDH–11.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Sept. 22, 2004.

Josiah M. Daniel, III, Vinson & Elkins, LLP, Dallas, TX, for Debtor.

Jonathan Scott Covin, Carrington, Coleman, Sloman & Blumenthal, Dallas, TX, for Movant Savoy Realty Company, Limited.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE MOTIONS OF SAVOY REALTY COMPANY LIMITED TO COMPEL AND FOR ADMINISTRATIVE EXPENSE CLAIM*

HARLIN D. HALE, Bankruptcy Judge.

These Findings of Fact and Conclusions of Law are made in regard to the motions filed by Savoy Realty Company, Limited ("Savoy") to compel the payment of Debtors' postpetition obligations under a non-residential real property lease (Docket No. 344, the "Rent Motion") and for allowance of administrative expense claim (Docket No. 679, the "Administrative Expense Mo-

tion") (collectively, the "Motions"). Based upon the entire record, in accordance with Bankruptcy Rules 7052 and 9014, the Court makes the following findings of fact and conclusions of law:

## I. JURISDICTION

1. The Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(b), and the Motions are core proceedings.

## II. BACKGROUND

2. Savoy leased the office premises that Nucentrix Broadband Networks, Inc., a/k/a Heartland Wireless Communications, Inc., *et al.* ("Debtors") occupied on the petition date and used as the headquarters of their business operations pursuant to a lease agreement dated January 1, 2001 between Nucentrix Broadband Networks, Inc. and CBPBC Phase VIII, LLC (the "Lease"). Following the filing of the Debtors' bankruptcy cases on September 5, 2003, (the "Petition Date") the Debtors entered into negotiations with Savoy regarding the status of the Lease.

3. On September 9, 2003, the Debtors filed the Motion to Extend Time to Assume or Reject Unexpired Leases of Non-Residential Real Property (Docket No. 18, as amended, the "Motion to Extend Time"), which included the Lease.

4. Savoy filed its Objection to the Motion to Extend Time (Docket No. 113, the "Objection") and its Notice of Appearance and Request for Service of Papers (Docket No. 112) on October 6, 2003.

5. On several occasions, the Court extended the deadline by which the Debtors must assume or reject the Lease. By an agreed order entered on February 13, 2004 (the "February Order"), the Court

extended the deadline by which the Debtors must assume or reject the Lease to February 19, 2004.

6. The Debtors filed their *Motion: (I) To Authorize Rejection Of Lease Of Non–Residential Real Property Nunc Pro Tunc As Of October 31, 2003; (II) To Authorize Entry Into A New Lease Effective November 1, 2003; And (III) To Approve Settlement* (Docket No. 335, the "Debtors' Motion") on February 19, 2004. Savoy responded by denying that the parties had an enforceable agreement and by filing a series of pleadings in order to challenge the settlement set forth in the Debtors' Motion.

7. The *Motion of Savoy Realty Company, Limited for Relief from Stay With Respect to a Non–Residential Real Property Lease and Brief in Support* (Docket No. 345, the "Lift–Stay Motion"), the first of that series of Savoy's pleadings to come on for hearing, was resolved by the agreed *Order Modifying Stay* (Docket No. 383) and by the Debtors' subsequent complete vacation of the premises at the heart of this dispute within a period of two weeks at the end of March 2004. See the *Order Approving Expedited Motion for Approval of New Lease of Office Space* (Docket No. 390) and the Debtors' *Notice of Change of Address* (Docket No. 439).

8. The Rent Motion is the second in Savoy's series of pleadings. The Debtors objected to the Rent Motion in their Initial Response (Docket No. 418), which they subsequently amended (Docket No. 750).

9. On April 12, 2004, the Court entered an Order continuing the hearing on the Rent Motion to a later date to allow for discovery and finding that the Debtors were "judicially estopped from claiming that they had an enforceable settlement agreement with Savoy on or before February 9, 2004" (Docket No. 449).

10. In addition to these pleadings, Savoy also filed proof of claim no. 217, which it later amended with proofs of claim nos. 290 and 319. The Debtors objected to Savoy's claim (Docket No. 382).

11. The Debtors filed their initial *Response to Savoy Realty Company's Motion to Compel Payment of Postpetition Obligations Under Non–Residential Real Property Lease* (Docket No. 418, the "Initial Response") on March 18, 2004 and their *Amended Response to Savoy Realty Company's Motion to Compel Payment of Administrative Rent* on August 11, 2004 (Docket No. 750, the "Amended Response").

12. The Debtors and Savoy have settled Savoy's general unsecured claim for lease rejection damages as set forth in the *Stipulation Regarding Amount of Lease Rejection Damages* (Docket No. 745). Moreover, the Debtors now do not dispute Savoy's claim for prepetition amounts totaling $3,883.63 for adjusted electrical costs and $3,596.12 for adjusted operating costs. The remaining disputes raised by the Rent Motion and the Administrative Claim Motion relate solely to Savoy's claim for postpetition amounts of rent and attorneys' fees.

## III. FINDINGS OF FACT

13. Savoy was the landlord for the premises that the Debtors occupied on the petition date and used as the headquarters of their business operations pursuant to the Lease.

14. Shortly before and following the Petition Date, the Debtors' senior management determined that due to the projected winding down of their business operations,

Debtors did not need all of the space leased under the Lease.

15. The Debtors' senior management also determined that the expense of maintaining the Lease, under which Debtors' monthly obligations were approximately $44,440.71, was greater than the Debtors' estates could afford based on available cash and resources at the time of filing of the Debtors' bankruptcy cases. Accordingly, the Debtors determined the terms of the Lease were not economically feasible. After the Petition Date, the Debtors began to look for alternative, less expensive office space.

16. After the Petition Date and prior to the end of September 2003, Carroll McHenry, the Chief Executive Officer of Nucentrix, met with Lucy Billingsley, the Chief Executive Officer of Savoy's Property Management Company, the manager of Savoy and of the leased premises, to inform Savoy that the Debtors intended to reject the Lease because of their inability to continue to meet the monthly rent obligations under the Lease.

17. Mr. McHenry and Ms. Billingsley entered into discussions regarding the premises subject to the Lease. These discussions took place at a meeting in mid to late-September 2003 and in telephone conversations thereafter. During such discussions, Ms. Billingsley, on behalf of Savoy, represented to Mr. McHenry that Savoy would allow the Debtors to (a) pay a lower base monthly rental rate of $11.25 per square foot, or $10,215.94 per month, plus reduced utilities, parking and operating expenses of $1,920.00 per month (the "Reduced Rent"), (b) occupy a smaller area (approximately 10,897 square feet) than the premises leased under the Lease (the "Reduced Premises"), and (c) occupy the Reduced Premises through April 30, 2004, unless extended by agreement of both parties. The Debtor reasonably inferred that this would be a permanent concession by Savoy; not a concession which would allow Savoy to later assert the full lease claim.

18. At the time of these discussions, it was foreseeable that the Debtors would rely on the representations of Savoy and Ms. Billingsley regarding the Reduced Rent and the Reduced Premises. Indeed, Mack Dennis, the Chief Financial Officer of Savoy's property manager, testified that Ms. Billingsley is honest, trustworthy, and can be relied upon. Additionally, Savoy knew that it was the intent of the Debtors to reject the Lease and vacate the premises absent these representations and that the Debtors would need to do so without concessions by Savoy.

19. The Reduced Rent of $12,135.94 covered base rent as well as utilities, parking, and operating expenses. Of the $12,135.94, $10,215.94 was allocated for rent, and $1,920.00 was allocated to utilities, parking, and operating expenses.

20. In light of the representations of Savoy regarding the Reduced Rent and the Reduced Premises, the Debtors abandoned their search for alternative, less expensive office space, and vacated all but the Reduced Premises.

21. The Debtors consolidated their property into the Reduced Premises and during the period from November 2003 through March 2004 (the "Applicable Period"), the Debtors occupied only the Reduced Premises.

22. In reliance on the representations of Savoy, during the Applicable Period, the Debtors paid the Reduced Rent as follows:

| Check Date | Check No. | Amount | Purpose of Payment |
|------------|-----------|--------|--------------------|
| 2/24/2004 | 401670 | $12,135.94 | March 2004 Rent and Utilities |
| 1/27/2004 | 401431 | $12,135.94 | Feb.2004 Rent and Utilities |
| 12/29/2003 | 400804 | $12,135.94 | Jan.2004 Rent and Utilities |
| 11/25/2003 | 400531 | $12,135.94 | Dec.2003 Rent and Utilities |
| 11/11/2003 | 400411 | $ 1,920.00 | Nov.2003 Utilities |
| 10/29/2003 | 400350 | $10,215.94 | Nov.2003 Rent |
| Total | | $60,679.70 | |

Savoy accepted and deposited into its account each of the above referenced checks, with only one minor complaint, mentioned below. Copies of these checks were admitted into evidence as Exhibit Nucentrix No. 1.

23. Savoy had policies in place to deal with situations where its tenants failed to timely and fully pay rent. Specifically, if rent was not timely and fully paid, Savoy would send out a "late notice" and contact the tenant to discuss the payment of rent. If this was unsuccessful in obtaining full payment of the rent, Savoy would send out a stronger demand letter and possibly a lock out notice. These policies would alert a tenant, such as the Debtors, that there was a problem in the lease payments. Despite the existence of these procedures, at no time from November 1, 2003 through March 31, 2004 did Savoy or its representatives demand any payment from the Debtors beyond the Reduced Rent.

24. Savoy contacted the Debtors about an underpayment of rent in early November 2003, but that contact was only regarding the Debtors' first payment of Reduced Rent. On October 29, 2003, the Debtors issued a check to Savoy in the amount of $10,215.94 for the base November rent. In early November 2003, Savoy contacted the Debtors to inform them that their check was short by $1,920.00, which was the reduced monthly charge for utilities,

parking and other incidental charges. The Debtors immediately issued another check for the balance, making a total monthly payment of $12,135.94. The Debtors continued to pay, and Savoy continued to accept, this amount without any notice of any other amount due and owing until the filing of the Rent Motion.

25. In reliance on the representations of Savoy, on November 10, 2003, the Debtors forecasted "Rents & Office Expense" approximately commensurate with the Reduced Rent in the budget (the "DIP Budget") that they submitted to the Court as part of their motion to approve debtor in possession financing (Docket No. 182).[1] A copy of the DIP Budget was admitted in evidence as Nucentrix Exhibit No. 2.

26. In reliance on the representations of Savoy regarding the Reduced Rent and the Reduced Premises, the Debtors refrained during all the intervening months from rejecting the Savoy lease.

27. In summary, the Debtors relied on Savoy's representations regarding the Reduced Rent and the Reduced Premises by:

a. not seeking alternative, less expensive office space;

b. vacating all but the Reduced Premises and continuing to occupy only the Reduced Premises from November 2003 through March 2004;

___

1. Savoy's counsel received electronic service of this motion and its exhibits, and no objection thereto was filed.

c. paying the Reduced Rent from November 2003 through March 2004;

d. not rejecting the Lease even though the Debtors' management had determined that the Debtors did not need, nor could they afford, the monthly obligations under Lease; and

e. using the Reduced Rent as the basis for forecasting "Rents and Office Expense" in the Debtors' DIP Budget.

28. Before the bankruptcy case, the parties had a good working relationship. Therefore, it was foreseeable that the Debtors would rely on the representations of Savoy, and, indeed, Savoy knew that the Debtors were relying on its representations regarding the Reduced Rent and the Reduced Premises.

29. Had Savoy disclosed to the Debtors its intention to seek to compel the Debtors to pay the full amount of rental obligations under the Lease for the months from November 2003 through March 2004, the Debtors could have and would have rejected the lease, vacated the premises, and sought alternative, less expensive office space. In fact, the Debtors did subsequently reject and move out promptly.

30. In February 2004, Savoy found a new tenant. The Debtors agreed to vacate the premises entirely by March 31, 2004. In order to do so, the Debtors obtained Court approval of and entered into a new lease for new office space (Docket No. 390). The Debtors were able to locate new office space, and negotiate and execute their new lease and move all of their furniture, records, and other personal properties into such new office space in approximately two weeks.

31. That the Debtors were able to locate new office space, and negotiate and execute a lease, and move into such office space within a time period of approximately two weeks suggests that the Debtors did not continue to occupy the Reduced Premises because of an inability to find alternative office space. Rather, these actions suggest that the Debtors continued to occupy such premises from November 2003 through March 2004 out of reliance on the representations of Savoy and its representatives.

32. Savoy filed pleadings with the Court and put on testimony evidencing that it has incurred approximately $110,000 in legal fees in connection with matters related to the Debtors' bankruptcy.

33. Mr. McHenry's testimony regarding the discussions with Ms. Billingsley was credible and persuasive. Ms. Billingsley did not testify at trial.

## IV. CONCLUSIONS OF LAW

34. The representations of Savoy and Ms. Billingsley constitute promises and/or representations which were relied upon by the Debtors to their detriment.

35. At the hearing, Savoy argued that these representations were an inadmissible part of settlement negotiations. However, the Court ruled that evidence of these representations is not excluded under Rule 408 of the Federal Rules of Evidence. While Rule 408 excludes evidence "to prove liability for or invalidity of the claim or its amount," Rule 408 allows the admission of evidence of conduct or statements made in compromise negotiations when "the evidence is offered for another purpose" such as, in this case, estoppel. Fᴇᴅ. R. Eᴠɪᴅ. 408; *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 292 (2d Cir.1999) (holding that "district court did not abuse its discretion in admitting settlement evidence for the limited purpose of proving Converse's estoppel claims"); *Bankcard*

*America, Inc. v. Universal Bancard Systems, Inc.*, 203 F.3d 477, 484 (7th Cir.2000) (admitting evidence regarding settlement negotiations to prove estoppel, and stating "it would be an abuse of Rule 408 to let [a party] lull [another party] into breaching the contract and then prevent [the other party] from explaining its actions because the lulling took place around the settlement table"). Part of the claim of estoppel arose during these discussions. The Court has found that the representations were made, and Savoy did not put on any evidence to the contrary. It would be unfair for Savoy to make representations to the Debtors that the Debtors clearly relied upon, and then hide behind Rule 408. The rule was not written for such purposes. It is the conduct and words used in the discussions that go to the heart of the Debtors' estoppel defense. Such conduct and words are admissible under Rule 408.

■ 36. Bankruptcy Courts are courts of equity. *See Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

■ 37. Estoppel is an equitable doctrine used to avoid injustice:

"Equitable estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result" and "is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought."

*In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2nd Cir.1996).

38. Bankruptcy courts routinely apply estoppel. *See, e.g., Sherman v. FSC Realty LLC (In re Brentwood–Lexford Partners, LLC)*, 292 B.R. 255, 272–73 (Bankr. N.D.Tex.2003) ("A party may only invoke equitable estoppel if it detrimentally relied on the misrepresentations of the other party. *Neiman–Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 371 n. 4 (5th Cir.1990) (addressing Texas law on equitable estoppel)"); *In re Magnolia Gas Co.*, 255 B.R. 900 (Bankr.N.D.Okla.2000); *In re Burford*, 231 B.R. 913 (Bankr.N.D.Tex.1999) (stating that a court will apply the doctrine of estoppel if (1) the party to be estopped was aware of the facts, and (2) intended its act or omission to be acted upon; (3) the party asserting estoppel did not have knowledge of the facts, and (4) reasonably relied on the conduct of the other to his substantial injury.).

■ 39. Moreover, bankruptcy courts clearly apply equitable estoppel against landlords:

[B]ankruptcy courts are inherently courts of equity with broad remedial powers. There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction. Bankruptcy courts are statutorily empowered to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. We are thus unwilling to limit as a matter of law a bankruptcy court's power to employ equitable doctrines of estoppel and waiver in adjudicating the rights of parties to an unexpired lease.

*Ranch House of Orange–Brevard, Inc. v. Gluckstern (In re Ranch House of Orange–Brevard, Inc.)*, 773 F.2d 1166, 1169 (11th Cir.1985) (internal quotations and citations omitted); *see also In re H & G Distrib., Inc.*, 158 B.R. 959, 962 (E.D.Pa.

1993).[2]

40. The doctrine of promissory estoppel applies to the circumstances surrounding the Lease following the Petition Date. Accordingly, Savoy is estopped from seeking the entire prepetition rent ($44,440.71 per month) and related attorneys' fees for the months of November 2003 through March 2004 because Savoy represented that it would accept Reduced Rent as full rent for such months, and Debtors relied on these representations to their detriment.

■ 41. Under Texas law, the elements of promissory estoppel are: (1) a promise, (2) foreseeability of reliance on the promise by the promisor, and (3) substantial detrimental reliance by the promisee. *English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983).

42. These elements are clearly met in this instance: (1) Savoy's affirmative representations to the Debtors constituted a promise to the Debtors that Savoy would accept the Reduced Rent as full rent to allow the Debtors to occupy the Reduced Premises during the Applicable Period, and this promise was reinforced by Savoy's acceptance of the Debtors' payment of the Reduced Rent during the Applicable Period without demand for any additional rent payments; (2) Debtors reasonably and justifiably relied on Savoy's representations to their detriment; and (3) The detriment suffered by the Debtors resulting from their reliance on Savoy's representations is substantial and is represented by the relief sought by Savoy in the Rent Motion and by the legal fees and expenses that the Debtors have been forced to expend to defend against Savoy's claims. Stated otherwise, the Debtors would have rejected the Lease and found alternative space (as they did shortly after the filing of the Lift Stay Motion) at a much cheaper price, if they knew that Savoy's representations that it would accept the Reduced Rent were false.

43. The doctrine of the promissory estoppel applies and operates to estop Savoy from seeking payment of rent in the amount of $44,440.71 for the months of November 2003 through March 2004.

---

**2.** Section 365(d)(3) of the Bankruptcy Code does not prevent the application of estoppel in this bankruptcy context. Although § 365(d)(3) states that acceptance of performance by a lessor "does not constitute waiver or relinquishment of the lessor's rights" under the applicable lease or title 11, the language of that subsection speaks to the termination of the lease under that provision, and that a landlord's acceptance of rent does not revive such lease after the provided time periods have expired.

Further, the Fifth Circuit has held that the doctrines of waiver and estoppel are separate and distinguishable:

Although waiver and estoppel are sometimes used interchangeably, ... there is a subtle but significant legal distinction between the two. Strictly defined, waiver describes the act, or the consequences of the act, of one party only, while estoppel exists when the party has induced the other party to take a position that would result in harm if the first party's act were repudiated. In contrast to waiver, then, estoppel involves some element of *reliance or prejudice.*

*Pitts v. American Security Life Ins. Co.,* 931 F.2d 351, 357 (5th Cir.1991) (emphasis added and citations omitted). That distinction is applicable here. The Debtors did not unilaterally send partial payments to Savoy; rather Savoy induced the Debtors to pay the Reduced Rent, and by sending such payments and delaying the rejection of the Lease, the Debtors acted in reliance on Savoy's representations to their detriment. Furthermore the Bankruptcy Court for this District has recognized that the doctrines of waiver and estoppel are separate: *In re Senioris,* 70 B.R. 79 "[U]nder the appropriate circumstances the principles of estoppel and waiver remain available to parties in bankruptcy." *In re Senioris,* 70 B.R. 79, 80 (Bankr.N.D.Tex.1987) (internal citations omitted).

## Attorneys' Fees

■ 44. The attorneys' fees and expenses sought by Savoy were incurred in its efforts to recover postpetition amounts in addition to the Reduced Rent. Because this Court has denied Savoy's request for such amounts, based on the doctrines of promissory estoppel, Savoy's request for legal fees and expenses is likewise denied.

■ 45. Alternatively, Savoy has failed to plead and to prove entitlement to attorneys' fees in the amount it seeks. Generally speaking, any claimant in a bankruptcy case seeking recovery of postpetition attorneys fees must file a traditional bankruptcy fee application. That is true for debtor's counsel, trustee's counsel, and committee counsel. Bankruptcy Code 330(a); *In re Lawler*, 807 F.2d 1207, 1211 (5th Cir.1987); *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1254 (5th Cir. 1986). That is also true for oversecured creditors who are specifically authorized by statute to recover their counsel's fees. Bankruptcy Code 506(b); *Blackburn–Bliss Trust v. Hudson Shipbuilders, Inc. (In re Hudson Shipbuilders, Inc.)*, 794 F.2d 1051, 1054 (5th Cir.1986); *In re Tierra Petroleum, Inc.*, 173 B.R. 106, 108 (Bankr. E.D.Tex.1994); *In re Allied Texas Investments, Inc.*, 4 Tex.Bankr.Ct.Rep. 159, 160 (Bankr.N.D.Tex.1990). It is true for unsecured creditors when they are entitled to attorneys' fees. *See In re Independent American Real Estate, Inc.*, 146 B.R. 546, 556 (Bankr.N.D.Tex.1992); *McDonald v. Lorenzo Bancshares, Inc. (In re Lorenzo Bancshares, Inc.)*, 122 B.R. 270, 272 (Bankr.N.D.Tex.1991) (unsecured claimant must "file an application for attorneys' fees in the usual bankruptcy format"). It is equally true for landlords' counsel. Considering the collective pleadings and testimony of Savoy regarding attorneys' fees and expenses as a fee application, the Court determines that such claims are too high, given the amounts involved, among other reasons.

■ 46. The Fifth Circuit has held that the following factors must be plead and established for any claimant to receive reasonable attorneys' fees from a bankruptcy estate:

(1) the time and labor required;

(2) the novelty and difficulty of the questions presented;

(3) the skill requisite to perform the legal services properly;

(4) the preclusion of other employment due to the acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client with the circumstances of the case;

(8) the amount involved and the results obtained;

(9) the experience, reputation and ability of the attorney;

(10) the undesirability of the case;

(11) the nature and length of the professional relationship with the client; and

(12) awards in similar cases.

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974); *See also In re First Colonial Corp. of America*, 544 F.2d 1291, 1298–99 (5th Cir. 1977), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977) (applying the *Johnson* factors to the analysis of fee awards in bankruptcy cases). The Court will assess these factors to determine the adjusted lodestar amount, representing the reasonable number of hours expended multiplied by reasonable hourly rates.

■ 47. Construing the pleadings and testimony of Savoy as a proper bankruptcy fee application, the application of the *Johnson* factors justifies the Court's determination that Savoy's request for the recovery

of attorneys' fees, in the amount sought, is not warranted. The first and eighth factors require an adjustment because the quantum of legal effort, represented by 31 docket entries filed or caused by Savoy and attorneys' fee invoices aggregating $110,000—70% of the amount of rent sought—is disproportionate. The second and third *Johnson* factors are given less weight because the legal questions were not particularly difficult and the skill required was ordinary. No showing was made as to *Johnson* factors (4), (6), (7), (10), and (11), and the Court is cognizant of customary fees for such work and awards in similar cases, the fifth and twelfth *Johnson* factors. The Court has recognized the experience, ability, and good reputation of the Savoy attorneys, but that factor standing alone doe not justify the fees sought. In short, the *Johnson* factors have not been shown, and an award of attorneys' fees, in the amount sought, is therefore not justified.

48. Based on the *Johnson* factors, particularly the amount sought, and the legal issues involved, an award of $71,500, or 65% of the $110,000 requested, would be awarded by the Court, if attorneys' fees were awarded to Savoy.

49. Any finding of fact that constitutes a conclusion of law shall be so construed, and vice versa, and this Court reserves the right to enter additional findings and conclusions and to issue a written opinion.

50. Based on these findings and conclusions, Savoy's request for postpetition rent is denied. Based on that ruling, Savoy's request for attorneys' fees is also denied. Debtors' counsel is directed to prepare an order denying the Motions.