**In re 900 CORP., et al., Debtors.**

**No. 03–35721–BJH–11.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

May 23, 2005.

---

Cynthia Cole, Neligan, Tarpley, Andrews & Foley, L.L.P., Dallas, TX, for Debtor.

### MEMORANDUM OPINION AND ORDER

BARBARA J. HOUSER, Bankruptcy Judge.

Before the Court are two applications for fees pursuant to 11 U.S.C. § 506(b) filed by Winstead, Sechrest & Minick, P.C. ("Winstead") as counsel to Wells Fargo Business Credit, Inc. ("WFBC"). The first application seeks fees of $191,435.50 and expenses of $2,253.63 incurred pre-confirmation, between May 7, 2003 and June 30, 2004 (the "First Application"). The second application seeks fees of $47,558.50 and expenses of $773.24 incurred post-confirmation, between July 1, 2004 and December 31, 2004 (the "Supple-mental Application"). Bag 'n Baggage, Ltd. and 900 Corp. (collectively, the "Debtors") oppose both applications. Also before the Court is the Debtors' objection to WFBC's proof of claim, as it relates to these fees. The Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K) and (O) and 28 U.S.C. § 1334.

The Court's ruling is as follows—with respect to the First Application, WFBC is entitled to $140,382.28 in fees and $2,253.63 of expenses. The remainder of the fees sought are disallowed under Texas state law (as to the pre-petition fees) and under section 506(b) of the Bankruptcy Code (as to the post-petition fees) because they are not reasonable within the meaning of either state law or section 506(b). With respect to the Supplemental Application, WFBC is not entitled to any fees or expenses for several reasons. First, section 506(b), under which WFBC seeks to recover its post-confirmation fees and expenses, authorizes the recovery of fees and expenses only from the date of the bankruptcy filing through the date of confirmation, and thus cannot provide the basis for any recovery of fees and expenses first incurred post-confirmation. Second, even if section 506(b) continued to be relevant post-confirmation, it authorizes the recovery of fees by an oversecured creditor. Having released its liens, WFBC was no longer a secured creditor at the time it incurred the fees and expenses sought in the Supplemental Application. Third, even if WFBC could avail itself of section 506(b) (as an unsecured creditor at the time its fees were incurred), that section allows for the recovery of attorneys' fees and expenses only where those fees and expenses are provided for by the agreement under which the claim arose. Here, the agreement under which WFBC's claim arose terminated by its own terms prior to

WFBC incurring the fees and expenses at issue in the Supplemental Application. Fourth, to the extent that WFBC is simply making a contractual argument that it is entitled to recover its fees and expenses based on the Debtors' plan of reorganization, the Court concludes that the plan does not provide any basis for the recovery of the fees and expenses sought in the Supplemental Application.

The Court's analysis with respect to its rulings is set forth in detail below.

## I. Factual Background

The Debtors filed voluntary petitions for relief under chapter 11 on June 3, 2003. The cases were jointly administered by Order dated June 9, 2003.[1] As of the petition date, WFBC was owed approximately $2.5 million, secured by liens on substantially all of the Debtors' personal property (including inventory).

These were atypical bankruptcy cases from a secured creditor's point of view. Very early in the cases, it became clear that WFBC was significantly oversecured, holding liens on assets worth several multiples of its debt. Moreover, no party ever challenged the validity or priority of WFBC's liens on the Debtors' assets. The Debtors filed a joint plan of reorganization quite quickly—*i.e.*, seven months into the cases, having extended their periods of exclusivity only once. That plan did not propose to impair WFBC in any way. The Debtors did not propose to cram down their plan over WFBC's objection, and WFBC was not expected to serve as an involuntary lender to the reorganized Debtors. In fact, instead of proposing to pay WFBC over time, as so many plans propose to do with respect to pre-petition secured lenders, the Debtors proposed to pay WFBC's claim in full, in cash, shortly after confirmation. Specifically, the Debtors proposed to obtain exit financing from a new lender and to use a portion of that new loan to pay WFBC's pre-petition secured claim in full. The cases were, in short, unusually *promising* from a secured creditor's point of view. Nevertheless, WFBC's counsel, with a cast of 17 lawyers and paraprofessionals, expended 589.1 hours and incurred $191,435.50 of fees and $2,253.63 of expenses in the protection of its $2.5 million oversecured claim.

The day after the bankruptcy filings, the Debtors filed an emergency motion to use cash collateral. On June 9, 2003, after two interim hearings, the Court signed an interim order authorizing the Debtors to use WFBC's cash collateral on specified terms. *See Interim Order Regarding Limited Use of Cash Collateral,* Docket No. 34. Two days later, the Debtors filed an "Emergency Motion to Compel Turnover of Debtors' Property in Compliance with Court Orders" (the "Motion to Compel"). The Motion to Compel alleged that the Debtors' Credit and Security Agreement dated September 5, 2002 with WFBC (the "Agreement")[2] required the Debtors to maintain their accounts at Wells Fargo *Bank* (an affiliate of WFBC), and that notwithstanding the entry of the cash collateral order, Wells Fargo Bank applied a debit hold on the Debtors' accounts and refused to re-

---

1. 900 Corp. is the general partner of Bag 'N Baggage, Ltd., which is the operating company. Because the cases have been jointly administered and the Debtors proposed and confirmed a single joint plan, the Court may refer occasionally to a singular bankruptcy case, although there are actually two bankruptcy cases.

2. The Agreement is actually between WFBC as lender and Bag 'N Baggage, Ltd. as borrower. However, 900 Corp. guaranteed all obligations under the Agreement and the parties, throughout their pleadings in these cases, did not differentiate between them.

lease the funds the Debtors were authorized to use. The Motion to Compel was granted on June 12, 2003.

As noted previously, it was determined very early in the cases that WFBC was oversecured,[3] and no party ever challenged the validity, priority, or extent of WFBC's liens on the Debtors' assets. On January 5, 2004, the Debtors filed a disclosure statement and a plan of reorganization which treated WFBC as unimpaired and proposed to pay it in full upon the closing of certain exit financing. While the plan was amended several times, WFBC's treatment never changed, and the plan ultimately confirmed by the Court on April 22, 2004 provided for WFBC to be paid, in full, from the exit financing.

Specifically, ¶ 6.02 of the confirmed plan states:

> The Holders of the Wells Fargo Secured Claim shall give the Debtors or the Reorganized Debtors written notice, at least 24 hours before the Credit Facility Closing Date, of the asserted amount of such Wells Fargo Secured Claim. The Debtors or the Reorganized Debtors shall pay such asserted amount in Cash in full on the Credit Facility Closing Date, which amount shall be the Allowed amount of the Wells Fargo Secured Claim unless, and notwithstanding section 6.02 of the Plan, a Debtor, the Reorganized Debtors, or the Creditors' Committee files with the Bankruptcy Court a written objection thereto within fifteen (15) days after the Credit Facility Closing Date. Wells Fargo's possession of the funds disbursed by the Debtors in satisfaction of the Wells Fargo Secured Claim shall not give rise to a secured claim to those funds ... In the event of any objection to the asserted amount of the Wells Fargo Secured Claim, the Bankruptcy Court shall determine the Allowed amount of the Wells Fargo Secured Claim, and the Holder thereof shall disgorge any amount by which such Allowed amount is less than the amount it received on the Credit Facility Closing Date on account of the asserted Wells Fargo Secured Claim.

**3.** There was testimony at a contested hearing on the use of cash collateral in July, 2003, following which the Court found that WFBC's equity cushion was "significant." In August, 2003, WFBC filed a motion seeking current payment of its costs, fees and expenses under section 506(b) as an additional component of adequate protection for the Debtors' use of cash collateral. The Debtors filed a motion to extend use of cash collateral. Both motions were settled by Order dated October 7, 2003. As part of the adequate protection provided to WFBC, and in recognition of its status as an oversecured creditor, the Third Order Regarding Use of Cash Collateral, ¶ 4(b), stated: "Debtors shall make a payment of $50,000 by no later than October 8, 2003 ... to be applied as payment of a portion the [sic] Lender's attorneys fees. Such payment is not representative of the current or total amount owed for such fees, and the Lender reserves the right to request as part of its secured claim the payment of the remainder of the fees generated thus far as well as those generated until confirmation, and the Debtors reserve the right to review the fee requests for reasonableness...."

The Fourth Order Regarding Use of Cash Collateral, entered on January 14, 2004, similarly recognized WFBC's status as an oversecured creditor, and provided:

> Debtors shall, on or before December 31, 2003, bring current all post-petition fees, costs, and expenses due and owing to Wells Fargo, including but not limited to audit fees, search fees, wire fees, and/or attorneys' fees (the latter, as of November 30, 2003, being in the sum of $88,240.27, which shall be paid to Winstead Sechrest & Minick P.C. on behalf of Wells Fargo) and, thereafter, shall keep current all post-petition fees, costs, and expenses due and owing to Wells Fargo, including but not limited to audit fees, search fees, wire fees, and/or attorneys' fees.

The order reserved the Debtors' right to later seek a judicial determination of the reasonableness of any portion of the fees.

Notwithstanding (a) any objection by a Debtor, the Reorganized Debtors, or the Creditors' Committee to the asserted amount of the Wells Fargo Secured Claim or (b) a Final Order of the Bankruptcy Court concerning any such objection, and except as otherwise set forth in this section, on the Credit Facility Closing Date, the Holder of the Wells Fargo Secured Claim shall execute such documents and take all other actions as may be necessary to release any liens and security interest they have in the Debtors' property. Notwithstanding anything else contained in the Disclosure Statement, the Plan, and the Confirmation Order ... and notwithstanding the confirmation of the Plan, Wells Fargo, as the Holder of the Wells Fargo Secured Claim, shall be entitled to all the liens, protections, benefits, and priorities granted to Wells Fargo under the Cash Collateral Order. All such liens, protections, benefits, and priorities shall continue until the Allowed Wells Fargo Secured Claim is paid in full or in part pursuant to a Court order. Until a Final Court Order is entered reducing the Wells Fargo Secured Claim, Wells Fargo, on the Effective Date, shall be paid its entire Allowed Claim, including all unpaid principal, accrued but unpaid interest and attorneys' fees, costs and expenses, as provided in the Cash Collateral Order through the date of the payment in full of the Wells Fargo Secured Claim. If the amount of the Wells Fargo Secured Claim is then reduced pursuant to a Final Court Order, Wells Fargo shall return to the Reorganized Debtor the difference between the amount in such Final Court Order and the amount paid at the Effective Date. This Class is unimpaired.

The phrase "Wells Fargo Secured Claim" was defined in the plan to mean any and all allowed amounts owed to WFBC under the Wells Fargo Credit Facility. In turn, the phrase "Wells Fargo Credit Facility" was defined as the pre-petition Credit and Security Agreement extended by WFBC on or about September 5, 2002. The phrase "Credit Facility" was defined as a credit facility of up to ten million dollars to be entered into by the Debtors with a lender and in form and substance acceptable to the Debtors and the Committee, and the phrase "Credit Facility Closing Date" was defined as the date on which the closing on the Credit Facility was concluded.

In other words, the plan provided that WFBC would give the Debtors notice, prior to the closing of their exit financing, of the amount which WFBC claimed was owed to it under the Agreement. The Debtors would pay that amount, and WFBC would release its liens once paid so that the exit lender could take liens on the Debtors' assets. The amount asserted by WFBC would be the allowed amount of its secured claim unless the Debtors filed an objection within fifteen days of the closing on the exit financing. If the Debtors filed such an objection, and the Court ultimately determined that WFBC was owed less than it had been paid, WFBC would disgorge the difference.

Moreover, the Order confirming the plan, ¶ 5, stated:

Pursuant to section 11.03 of the Plan the property and assets of the Debtors' Estates under section 541 of the Bankruptcy Code will revest in Reorganized Debtors on the Effective Date free and clear of all Claims and Interests, but subject to the obligations of Reorganized Debtors as set forth in the Plan and the Confirmation Order. Additionally, notwithstanding anything to the contrary in section 11.03 of the Plan, the liens of Wells Fargo as the Holder of the Wells Fargo Secured Claim shall remain upon

the Debtors' assets until the Allowed Wells Fargo Secured Claim has been paid in full as provided in section 6.02 of the Plan. Commencing on the Effective Date, and subject to the terms of this Confirmation Order, Reorganized Debtor [sic] may deal with its assets and property and conduct its business without any supervision by, or permission from, the Court or the office of the United States Trustee, and free of any restriction imposed on the Debtors by the Bankruptcy Code or by the Court during the Cases.

On May 4, 2004, WFBC provided the Debtors with the notice contemplated by the plan, in the form of a letter to the Debtors (the "Payoff Letter"). The Payoff Letter states:

> You have requested us to accept, from you, payment in full of all indebtedness and liabilities of Bag'n Baggage, Ltc. ("Borrower") owing as of May 3, 2004 (the "Payoff Date") and to terminate our financing arrangement with and security interest in collateral of the Borrower and Carribean Marine, Inc. ("CMI").

> We are agreeable to doing so as outlined herein. The figure that we have compiled, with respect to the indebtedness and liabilities ... as of the Payoff Date is $2,688,615.08 (the "Payoff Amount"). The Payoff Amount assumes no further borrowings since May 3, 2004 ... This figure is subject to adjustment because of checks deposited to the credit of this account being returned NSF or because entries in process, at this date, have not been reflected in the original amount specified above or because of errors in computation or other clerical errors, or for any other reason. If, by reason of such adjustments made not later than sixty days after the Payoff Date, an additional amount is found to be owed by the Borrower, you agree by your

endorsement hereof, to promptly reimburse us for such additional indebtedness ... It is understood and agreed that our cancellation and termination of financing arrangements with, and security interest in collateral of the Borrower and CMI, is being done in consideration of and in reliance upon your agreement as provided herein. Upon confirmation of receipt of the Payoff Amount, you are authorized to file UCC–3s terminating any and all UCC–1 financing statements showing us as "security party . . . ."

On May 19, 2004, the Debtors filed a notice with the Court indicating that the plan's effective date occurred on May 10, 2004. On May 14, 2004, the Debtors paid WFBC the Payoff Amount—*i.e.*, the sum of $2,688,615.08 and WFBC released its liens. The Payoff Amount included a $100,000.00 early termination fee and the attorneys' fees and expenses now sought in the First Application.

On May 21, 2004, within the time frame permitted by the parties' agreement and the plan, the Debtors filed an objection to WFBC's claim, objecting to both the termination fee and to the reasonableness of WFBC's attorneys' fees and expenses. Because WFBC's proof of claim provided no detail regarding its requested fees and expenses, the Court directed WFBC to submit a fee application. On January 18, 2005, WFBC filed both the First Application and the Supplemental Application. The Debtors' objection to the termination fee has been withdrawn, leaving the Court to decide the reasonableness of WFBC's fees and expenses.

## II. THE FIRST APPLICATION

### (i) The Legal Standards

Section 506(b) of the Bankruptcy Code provides:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

■ Because section 506(b) refers to reasonable fees, costs, or charges which may be added to an "allowed secured claim," it relates only to those fees, costs, or charges incurred post-petition. *In re Cummins Utility, L.P.*, 279 B.R. 195 (Bankr.N.D.Tex.2002). Attorneys' fees incurred by a secured lender pre-petition are tested for reasonableness under applicable state law. *Id.*

■ Here, the Agreement is governed by Texas state law. Under Texas law, a party may recover its attorneys' fees when it is authorized to do so by statute or when the parties' contract so provides. *AU Pharmaceutical, Inc. v. Boston*, 986 S.W.2d 331 (Tex.App.—Texarkana 1999). Section 8.5 of the Agreement provides that the Debtors shall pay "reasonable attorneys' fees ... incurred in connection with the negotiation, preparation, execution, amendment, administration, performance, collection, and enforcement of the Obligations and all such documents and agreements and the creation, perfection, protection, satisfaction, foreclosure, or enforcement of the Security Interest." Accordingly, WFBC has a contractual right to recover its pre-petition fees and expenses to the extent that those fees and expenses are reasonable.

■ In *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex.1997), the Texas Supreme Court identified eight factors to be considered in determining the reasonableness of an at-

torneys' fees request. Those factors are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *See also Fluorine on Call, Ltd. v. Fluorogas, Ltd.*, 380 F.3d 849 (5th Cir.2004); *Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554 (Tex.App.—Austin 2004). Here, $26,684.00 of the fees sought in the First Application were incurred prior to the Debtors' bankruptcy filings and must be judged by this state law standard.

■ The reasonableness of the remainder of the fees sought in the First Application will be determined under the standard set forth in section 506(b) of the Bankruptcy Code and federal law. *In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051 (5th Cir.1986). The purpose of the reasonableness requirement of section 506(b) is to ensure that a creditor "is not given a blank check to incur attorneys' fees which will be reimbursed out of its collateral. If proper restraint is not exercised, the costs of any 'overlawyering' should be borne by the Creditor, rather than Debtors." *In re Center*, 282 B.R. 561, 567 (Bankr.D.N.H. 2002) (quoting *In re Staggie*, 255 B.R. 48, 54 (Bankr.D.Idaho 2000)). In assessing the reasonableness of the requested fees,

the court "is to consider several factors ... which call upon the court to weigh the time and labor devoted to the matter, its difficulty, whether the fee is fixed or contingent, the amount involved, the results obtained, and other awards in similar cases. In addition, the bankruptcy court is to bear in mind that the debtor's estate must be administered as efficiently and economically as possible, and that sometimes bankruptcy attorneys perform dual functions which might lead to an award of duplicative fees if overlooked." *Id.* at 1058 (citing *In re First Colonial Corp. of America,* 544 F.2d 1291, 1299 (5th Cir.1977) and *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974)). The bankruptcy court is to assess the *First Colonial* factors to determine the adjusted lodestar amount, representing the reasonable number of hours expended multiplied by reasonable hourly rates. *In re Nucentrix Broadband Networks, Inc.,* 314 B.R. 581, 590 (Bankr.N.D.Tex.2004).

■ As is clear from this discussion, the factors to be considered in assessing the reasonableness of Winstead's requested fees under either Texas state law or section 506(b) of the Bankruptcy Code are virtually identical. *General Elec. Capital Bus. Asset Funding Corp. v. S.A.S.E. Military, Ltd.,* No. SA–03–CA–189RF, 2005 WL 839098 (W.D.Tex. April 12, 2005).

### (ii) Analysis of the Requested Fees

#### 1. Staffing Issues

WFBC was primarily represented in the Debtors' bankruptcy cases by Michael Sutherland ("Sutherland"), an experienced partner in Winstead's bankruptcy section billing at $425 per hour,[4] Wade Carvell ("Carvell"), a senior associate in Winstead's bankruptcy section billing at between $280 and $300 per hour, and Linda Paquette, a paralegal. Notwithstanding the expertise of Sutherland and Carvell, a total of 6 partners, 6 associates, 2 law clerks, and 3 paraprofessionals performed work on these cases during the First Application period. Michael Hilliard ("Hilliard"), the chairman of Winstead's banking section who represented WFBC before the cases were filed and remained very involved in the cases once filed, testified that for a "normal" commercial loan of the magnitude involved in these cases, Winstead would typically staff the engagement with two to four attorneys, although if special expertise were required on any given issue, they might look to an attorney in the applicable practice area for assistance. Hilliard also testified that Jeffrey Hage, a litigation partner, performed some work in connection with contemplated litigation against a related borrower who was in breach of a pledge agreement supporting the Debtors' credit facility, and that Phillip Lamberson and Frasher Murphy performed some work in the early and critical stages of the cases while Sutherland was on vacation. Based upon this testimony, the Court finds the fees incurred by Hage, Lamberson, and Murphy to be reasonable.

There was no other evidence, however, that any special expertise was required in these cases, and many of the staff and professionals who worked on the cases performed minimal services. In short, no explanation was provided for the participation of so many other Winstead attorneys and staff. In the absence of any reasonable explanation, and based on the Court's understanding of the facts of these cases, the Court finds that the level of staffing by Winstead professionals was simply not reasonable—WFBC had a relatively small loan, secured by collateral worth several multiples of its debt, an

---

**4.** The hourly rates charged by Winstead are reasonable.

unchallenged lien position, and was unimpaired under the Debtors' plan. Accordingly, the Court concludes that the estates should not bear the cost of this overstaffing, and disallows 27.1 hours for a total of $3,000 on this basis.[5] *See In re Green Valley Beer*, 281 B.R. 253 (Bankr.W.D.Pa.2002).

The Court also notes that despite the fact that these cases were primarily handled by a partner and senior associate in the bankruptcy section, both of whom have significant experience, Hilliard, Chairman of Winstead's banking section and billing at $460 per hour, expended over 87 hours on these cases at a cost of more than $40,000 (approximately 21% of the total fees sought by Winstead). Hilliard testified that he was the attorney in charge of the pre-petition loan between the parties, and that some of the work for which WFBC seeks reimbursement involved issues respecting the Debtors' default, the loan acceleration, and potential debtor-in-possession financing. Hilliard further testified that near the end of the cases, he was asked to review documents regarding the loan payoff and the requirements of the takeout lender. The Court finds his participation in these tasks understandable, and the time expended reasonable.

■■■ However, Hilliard also billed time in connection with the following categories of activities:[6] Asset Disposition and Recovery (7.1 hours), Business Operations (16.2 hours), Case Administration (5.2 hours), Claims Administration and Objections (5 hours), Cash Collateral (17.5 hours), Litigation (5.5 hours), and Plan and Disclosure Statement (3.9 hours). In addition, Hilliard billed time pre-petition which is not categorized. In many instances, the time entries are vague, such that the Court is unable to determine the need for someone of his expertise and experience to be involved in the task (*see, e.g.*, 5/21/03—"telephone calls"; 6/10/03—"review motions and orders; telephone conferences about bankruptcy related issues; comment on various papers"). In other instances, the time entry is descriptive, but sheds no light on the need for his expertise (*see, e.g.*, 11/24/03—"brief review of October operating statements and conference with client about open issues"). Hilliard testified that these entries conform to WFBC's requirements for time entry detail, and counsel argued that the time entries need not satisfy the requirements of section 330 of the Bankruptcy Code. However, the burden is on the oversecured creditor seeking fees under section 506(b) to show that its fees are reasonable, *In re Atwood*, 293 B.R. 227 (9th Cir. BAP 2003); *In re White*, 260 B.R. 870 (8th Cir. BAP 2001), and the time entries must contain sufficient detail to enable the Court to make that determination.

Many of Hilliard's time entries do not contain sufficient detail to enable the Court to determine the reasonableness of his fees. Moreover, WFBC has not established the need for the chairman of Winstead's banking section to be involved in so many aspects of these cases, given the experienced bankruptcy lawyers primarily responsible for the handling of the bank-

---

**5.** Specifically, the Court disallows the fees for time incurred by Mark Brannum and Brian Morris (partners); Jeffrey Carruth, Heather Smith, Chad Robinson, and Jeff Matthews (associates); Matthew Ferris and William Themer (law clerks); Dorothy McDowell and Elisa Weaver (paralegals); and a "Court Runner."

**6.** As part of its request that Winstead file fee applications, the Court asked Winstead to use the same categories of activities that counsel for the Debtors had used in its fee applications. Winstead complied with this request.

ruptcy cases. Accordingly, the Court will disallow 40% of his time, or $13,597.60.[7]

### 2. Fees Incurred on the Motion to Compel

Hilliard testified that WFBC and Wells Fargo Bank are separate legal entities, and that WFBC is not authorized to maintain deposit accounts. Therefore, the Agreement required the Debtors to maintain their bank accounts at Wells Fargo Bank (an affiliate authorized to accept deposits), and the parties' lockbox arrangement used a third party provider with funds flowing into the Wells Fargo Bank accounts. Hilliard further testified that Winstead did not represent Wells Fargo Bank in these cases, although it has represented Wells Fargo Bank on many other occasions. Therefore, WFBC argues that the debit hold placed on the Debtors' accounts, which necessitated the Motion to Compel, was beyond its control and its counsel had no ability to foresee that Wells Fargo Bank would freeze the Debtors' funds. The Court accepts at face value Winstead's argument that its *banking* section regularly represents Wells Fargo Bank, but that its *bankruptcy* section does not, and therefore it was unable to predict the freeze or prevent its occurrence.[8]

However, the First Application discloses that between June 11, 2003 and June 13, 2003, no less than seven people billed an aggregate of 36 hours at a cost of $11,358.50 in connection with the Motion to Compel. Sixty one percent of that time was billed by partners, and over half of the partner time was billed by Hilliard at $460 per hour. That is simply excessive. The time expended to correct what should have been a relatively simple administrative problem between affiliates, and the experience level of the professionals used, is not reasonable. Therefore, the Court will disallow as a charge against these estates the sum of $7,277.33.[9]

### 3. Fees Incurred in Connection with the Plan and Disclosure Statement

Winstead expended a total of $21,187.50 in this category. Of that sum, $17,079.50 was expended *after* the initial plan and disclosure statement were on file. As noted earlier, both the initial plan and the confirmed plan treated WFBC as unimpaired and proposed to pay it in full, in cash, on the effective date, which was defined as the first business day which was ten days after confirmation on which the confirmation order was not stayed and all

---

**7.** The Court has elsewhere disallowed some of Hilliard's time. Specifically, the Court has disallowed 2.1 hours expended in connection with the plan and disclosure statement, for a total of $966. The Court has also disallowed two thirds of the fees attributable to the time expended in connection with the Motion to Compel, 10.8 hours of which was expended by Hilliard. The Court also disallowed .5 hours of his time in connection with interoffice conferences. The Court has excluded all of this time prior to applying the percentage reduction, to avoid duplicative reductions. Specifically, Hilliard billed a total of 87.3 hours, 13.4 of which the Court has disallowed elsewhere in this Memorandum Opinion and Order, leaving a total of 73.9 hours, at $460 per hour, for a total of $33,994.

Forty percent of that amount is the $13,597.60 disallowed here.

**8.** Of course, that ignores the extensive involvement of Hilliard in these cases—who chairs Winstead's *banking* section.

**9.** Of the $11,358.50 billed, the Court has already disallowed $442.50 due to overstaffing. The balance is $10,916. The Court will allow 1/3 of this time and disallow the remainder. The amount allowed is the equivalent of 10 hours of attorney time at the blended hourly rate of Sutherland and Carvell, which should have been more than enough time to dispose of what should have been a relatively simple administrative problem between the affiliates.

conditions to the effectiveness of the plan had been satisfied or waived, but in no event later than April 30, 2004. Therefore, because WFBC "could have had little doubt about its prospects for repayment under the note[ ], the court finds that action by [WFBC] necessary to protect its interests should have been minimal." *In re Delaney Family, L.P.*, No. 02–46631–DML–11, 2003 WL 23957146 at *6 (Bankr. N.D.Tex. May 28, 2004).

Yet, Winstead expended another fifty-plus hours in this category, some of which was duplicative, after it knew what WFBC's plan treatment was. Hilliard billed 2.1 hours for reading the plan, disclosure statement, and confirmation order, notwithstanding the fact that Sutherland and Carvell also billed for those same tasks. It was probably unnecessary for both Sutherland and Carvell to read (and bill for reading) those documents. It was certainly unnecessary for all three lawyers to bill for the same document review. Accordingly, the 2.1 hours spent by Hilliard will be disallowed (a cost of $966) as duplicative and unreasonable.

Moreover, Sutherland and Carvell billed $15,187.50 of additional fees after it was clear that WFBC's claim would be paid in full shortly after confirmation. The additional time spent was unreasonable. While someone may have needed to monitor the cases to insure that WFBC's plan treatment did not change, or that the Debtors' circumstances did not dramatically worsen, the amount of time expended, and the level of expertise of the attorney expending it, far exceeded the reasonable need for involvement by Winstead on WFBC's be-

half.[10] Accordingly, the Court will disallow 50% of that amount, or $7,593.75.

### 4. Fees Incurred for Inter–Office Conferences and Other Problem Entries

The bankruptcy judges for the Northern District of Texas issued General Order 2000–7, adopting Guidelines for Compensation and Expense Reimbursement of Professionals (the "Guidelines"), which are applicable to all requests for compensation and expense reimbursement, including those by a creditor's counsel. *In re Anderson Grain Corp.*, 222 B.R. 528 (Bankr.N.D.Tex.1998).[11] The Guidelines provide that a failure to explain time spent in conferences with other professionals in the same firm, through a discussion of the complexity of the issues involved and the necessity of several individuals' involvement, may result in the disallowance of either all or a portion of the fees related to such conferences. The Guidelines further state that mere notations of conferences, without identifying the matter involved, may result in disallowance of that time.

First, the Court notes that there are several instances where more than one Winstead attorney billed for attending an inter-office conference, but failed to explain (either in the application itself or at the hearing on the application) why the inter-office conference was necessary. *See, e.g.*, entries dated 8/14/03, 9/11/03, 9/12/03, 9/18/03 and 11/24/03. In those instances, the Court disallows the time spent by the attorney billing the lesser amount of time, for a total disallowance of $1,302.00.

**10.** In fact, after the plan and disclosure statement were on file, the Winstead firm expended another 148 hours on the cases at a blended rate of just over $300 per hour.

**11.** The Guidelines have no application, however, to the time incurred prior to the bankruptcy filing, the reasonableness of which must be determined by reference to Texas state law.

Next, the Court notes that many of the time entries containing inter-office conferences also suffer from another infirmity—*i.e.*, the time entries "lump" several tasks together, such that the Court is not able to determine how much time was spent at the conference versus how much time was spent on the other tasks listed in the entry. The Guidelines also prohibit such lumping, except for "minor administrative matters ... where the aggregate time attributed thereto is relatively minor." *See* Guidelines, ¶ II(D). The Court has identified time entries totaling some 101.1 hours, with corresponding fees of $39,712, which contain both inter-office conferences and impermissible "lumping" of other tasks. When time entries are vague or lumped together, such that the Court cannot determine how much time was spent on particular services, then the creditor has not met its burden to show that its fees are reasonable. *In re Staggie*, 255 B.R. 48 (Bankr.D.Idaho 2000); *In re Ward*, 190 B.R. 242 (Bankr.D.Md.1995) (stating that a percentage reduction in fees under section 506(b) is appropriate where tasks were lumped together in time entries and entries contained only vague or insufficient description of services performed). The Court will accordingly reduce those fees by 25%, or $9,928.00.[12]

The Court notes that in general, many of Winstead's time entries are vague, and do not provide sufficient detail by which the Court can assess the reasonableness of the fee. Moreover, the Court presided over the entirety of these cases and believes that some of the time expended by Winstead was not reasonable given the circumstances of the cases. For example, and as noted previously, testimony established early in the cases that WFBC was significantly oversecured. Notwithstanding that finding, WFBC continued to attempt to extract further adequate protection from the Debtors as *quid pro quo* for the use of cash collateral. Pursuant to the terms of the Fourth Order Regarding Use of Cash Collateral, *see* Docket No. 243, the Debtors were authorized to use WFBC's cash collateral through March 19, 2004. The hearing to consider confirmation of the plan, which proposed to cash out WFBC, was scheduled for March 23, 2004. WFBC would not agree to the continued use of cash collateral for four days—*i.e.*, to the confirmation hearing, despite the fact that it was oversecured and about to be paid in full, without payment of an "extension fee." The Debtors were compelled to file an emergency motion for use of cash collateral, which the Court granted, and the Court denied WFBC's request for further adequate protection. This hearing was unnecessary under the circumstances of these cases. There was no reason for WFBC to oppose a short extension of the cash collateral order and no reason for WFBC to demand more fees from the Debtors in exchange for that agreement.

12. The Court has taken pains to avoid duplicative reductions. For example, the Court previously disallowed time spent by certain professionals because there has been no showing that 17 professionals and staff were required for these cases. The Court has also previously disallowed time where two attorneys billed for attending the same conference. The Court has excluded those previously-disallowed time entries from its total prior to applying the 25% reduction. Specifically, of the 101.1 hours of time entries with lumping and inter-office conferences, the Court previously disallowed 3.1 hours (for a total of $1,302) for duplicative billings for unexplained inter-office conferences. The remainder of fees after these reductions totals $39,712. Twenty-five percent of that sum is $9,928.00. In addition, the Court notes that although the Guidelines do not apply to the pre-petition time period, a percentage reduction is nonetheless appropriate under state law, since the lack of detail in Winstead's time entries leaves the Court unable to determine reasonableness of the fees under state law either.

The Court does not fault Winstead for its zealous representation of its client. Nonetheless, where "counsel is providing professional services to one client which, contractually, are assessable against another party, the burden is on the professional to exercise particularly careful billing judgment when formulating their strategy." *In re Crowley*, 293 B.R. 628, 633 (Bankr.D.Vt.2003). The Court must heed the purpose of section 506(b)—to "protect estate assets from excessive fees by oversecured creditors' attorneys 'exhibiting excessive caution, overzealous advocacy and hyperactive legal efforts.'" *Id.* (quoting *In re Gwyn*, 150 B.R. 150, 155 (Bankr.M.D.N.C.1993)). Accordingly, the Court will reduce the fees sought by an additional five percent, or $7,388.54.[13]

In summary, Winstead's requested fees in the First Application are reduced by the following amounts:

(i) $3,000 for overstaffing;

(ii) $13,597.60 of Hilliard's time;

(iii) $7,277.33 on the Motion to Compel;

(iv) $966 of duplicative time—plan and disclosure statement;

(v) $7,593.75 on the plan and disclosure statement generally;

(vi) $1,302 for unexplained inter-office conferences;

(vii) $9,928 for improper lumping of time entries, etc; and

(viii) $7,388.54 for vague time entries;

for a total reduction of $51,053.22. The expenses sought by Winstead in the First Application are reasonable. Accordingly, Winstead shall be allowed fees of $140,382.28 and expenses of $2,253.63 in connection with the First Application.

---

**13.** This amount is calculated as follows: $191,435.50 of fees sought, less prior reductions of $43,664.68, leaves a remainder of

## III. THE SUPPLEMENTAL APPLICATION

### (i) Contentions of the Parties

The Debtors contend that once confirmation occurs, bankruptcy jurisdiction ceases to exist except for matters which pertain to implementation or execution of the plan. They assert that there is no provision in the plan that allows WFBC to seek additional post-confirmation fees, and thus the court lacks jurisdiction to determine WFBC's entitlement to those fees. The Debtors point out that the plan went effective on May 10, 2004, and that WFBC released its liens shortly thereafter, such that the fees sought in the Supplemental Application arose at a point when WFBC was no longer a secured creditor. The Debtors further contend that there is no statutory basis upon which WFBC may seek post-confirmation fees, because section 506(b) is relevant only until confirmation. Finally, the Debtors contend that by the terms of the Payoff Letter, WFBC was required to submit all adjustments to the Payoff Amount no later than July 9, 2004, and therefore the Payoff Letter limits WFBC's ability to seek the fees sought in the Supplemental Application, which were incurred after that date.

In contrast, WFBC contends that "[n]otwithstanding the payoff of [WFBC's] secured claim under the Plan, the Debtor remains obligated thereon under the Credit Agreement and, subject to this Court's approval as 'reasonable,' under 11 U.S.C. § 506(b)." *See First Supp.App.* at ¶ 2. It also contends that the Payoff Letter cannot, by definition, limit its ability or give it a deadline to make adjustments which would have been legally and factually impossible to make prior to the sixty-day

---

$147,770.82, of which five percent is $7,388.54.

deadline—*i.e.*, WFBC contends that it cannot possibly have made adjustments within the sixty days stated in the Payoff Letter for fees which were not incurred in defending its claim until *after* the sixty days had passed. In addition, WFBC contends that the adjustments referenced in the Payoff Letter were in connection with a discrete list of administrative charges, and do not reference attorneys' fees. Finally, WFBC contends that its rights under section 506(b) were not cut off by confirmation, because it was an unimpaired creditor and, as a matter of law, all of its contractual rights passed through the bankruptcy cases and exist post-confirmation.

### (ii) Legal Analysis

■ Initially, the Court rejects the Debtors' argument that this Court lacks post-confirmation jurisdiction to determine WFBC's right to post-confirmation fees, since WFBC is claiming a right to fees pursuant to section 506(b). Thus, its claim invokes a substantive right provided by title 11, and is a "core" proceeding which arises under title 11 within the meaning of 28 U.S.C. § 1334. As "[b]ankruptcy law will ultimately determine this dispute," the test for post-confirmation jurisdiction set forth in *In re Craig's Stores, Inc.*, 266 F.3d 388 (5th Cir.2001) is satisfied. *In re U.S. Brass Corp.*, 301 F.3d 296 (5th Cir.2002).

■ Section 506(b) "applies only from the date of filing through the confirmation date." *Matter of T–H New Orleans Ltd. P'ship*, 116 F.3d 790, 797 (5th Cir.1997) (addressing post-petition interest and citing *Rake v. Wade*, 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993) (overruled on other grounds by 11 U.S.C. § 1322)).

Thus, the Court agrees with the Debtors that section 506(b) does not provide authority for WFBC's recovery of post-confirmation attorneys' fees. *See In re Henthorn*, No. 03–4156, 127 Fed.Appx. 15, 2005 WL 293646 (3rd Cir. Feb.9, 2005) (unpublished disposition); *Telfair v. First Union Mortgage Corp.*, 216 F.3d 1333 (11th Cir. 2000); *In re Shaffer*, 287 B.R. 898 (Bankr. S.D.Ohio 2002).

■ Even if section 506(b) continues to be relevant post-confirmation, it authorizes the recovery of attorneys' fees by an oversecured creditor. It is undisputed that WFBC was not a secured creditor at all, oversecured or otherwise, at the time the fees sought in the Supplemental Application were incurred. Rather, WFBC released its liens on the Debtors' property when it was paid in May, 2004. As such, it was not, on the dates the fees sought in the Supplemental Application were incurred, the holder of "an allowed secured claim ... secured by property" as required by section 506(b). For the reasons persuasively set forth by Judge Robert Jones, which need not be repeated here, the Court rules that as an unsecured creditor at the time the fees in the Supplemental Application were incurred, WFBC may not recover its post-petition attorneys' fees from the Debtors' estates, even where provided for by the pre-petition agreement. *In re Pride Companies, L.P.*, 285 B.R. 366 (Bankr.N.D.Tex.2002); *see also In re O'Connor*, No. 99–36662–SAF–7 (Bankr. N.D.Tex.2003) (slip copy) (unsecured creditor not entitled to attorneys' fees under section 506(b)).[14]

WFBC next contends that "[n]otwithstanding the payoff of [WFBC's] secured

---

14. WFBC argued at the hearing that it released its lien in reliance on the Debtors' agreement to pay all sums owed to WFBC under its pre-petition loan documents. However, as noted below, its agreement to terminate its security interest was "in consideration of and in reliance upon your agreement ... [to pay] the Payoff Amount," which was defined as the amount owed as of May 3, 2004. *See* Payoff Letter dated May 4, 2004.

claim under the Plan, the Debtor remains obligated thereon under the Credit Agreement and, subject to this Court's approval as 'reasonable,' under 11 U.S.C. § 506(b)." *See First Supp.App.* at ¶ 2. First, for the reasons explained more fully below, the Court finds that the Debtors' obligation to reimburse WFBC for its attorneys' fees terminated upon the termination of the Agreement, and that the Agreement was terminated prior to WFBC incurring the fees at issue in the Supplemental Application. WFBC cites *In re Staggie,* 255 B.R. 48 (Bankr.D.Idaho 2000) and *In re American Punjab Corp.,* 150 B.R. 763 (Bankr. E.D.Ca.1993) for the proposition that "a secured creditor's right to attorney's fees under 506(b), and consideration of those fees by the court, survives payment of the secured creditor's claim." *See* letter from WFBC's counsel dated March 4, 2005, Docket No. 427. Those cases are, however, wholly distinguishable, as neither involved a secured creditor trying to recover fees incurred after the debt was paid in full and its lien was released. Rather, both cases involve challenges to attorneys' fees which were first asserted after the debt was paid, but the challenged fees were incurred prior to the payment of the debt.[15]

Even if WFBC was somehow still entitled to the recovery of its reasonable attorneys' fees after it released its liens and was no longer a secured creditor, section 506(b) authorizes the recovery of reasonable fees only if they are provided for in the agreement under which the claim arose. *U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). In these cases, the note obligates the Debtors to "pay all costs of collection, including reasonable attorneys' fees . . . ." The Court does not believe that this language is broad enough to permit WFBC to recover its attorneys' fees incurred after the debt has been paid in full. However, Section 8.5 of the Agreement contains broader language which arguably could obligate the Debtors to pay the reasonable attorneys' fees incurred by WFBC in defending its claim, even after that claim was paid. However, for that provision to be applicable, the Agreement would have to remain in effect between the parties. And, for the reasons explained below, the Court concludes that the Agreement has been terminated.

Section 2.12 of the Agreement provides that the borrower can terminate the agree-

---

**15.** WFBC cites *In re PCH Assoc.,* 122 B.R. 181 (Bankr.S.D.N.Y.1990) for the proposition that it is entitled to collect fees incurred in defending its claim, even after its claim was satisfied. Specifically, WFBC cites language in *PCH* which states " 'the contractual provision regarding recoverable attorneys' fees evidences an intention by both parties to allow the Third Mortgagee *to recoup its costs in defending its claim.*' " *Letter* from WFBC's counsel dated March 4, 2005, Docket No. 427.

However, *PCH* is inapposite. In that case, the bankruptcy court was reviewing the reasonableness of fees under section 506(b). One factor the court considered was whether the legal fees were authorized by the loan agreement. The loan agreement in *PCH* limited recovery to 3% of the outstanding debt

where the mortgagee successfully confessed judgment against the mortgagor, and the debtor-mortgagor sought to limit the mortgagee's recovery to 3% of its debt. The *PCH* court ruled that the 3% limitation was designed to protect the mortgagor where the judgment would be issued without its prior knowledge. The *PCH* court ruled that the 3% limitation was not applicable in the section 506 context because in bankruptcy proceedings, the mortgagor has an opportunity to contest the reasonableness of fees. It was in this context that the court determined that the intent of the parties was that the mortgagee could recoup its costs in defending its claim, and ruled that the mortgagee was not limited to a 3% recovery but could recover its reasonable fees.

ment by giving the lender at least 30 days' prior written notice and paying the lender the termination fee in accordance with Section 2.9(e). In turn, Section 2.9(e) requires the borrower to pay a fee of 2.0% of the maximum line of credit if the termination occurs after September 5, 2003. The Payoff Letter recites that the Debtors requested WFBC to accept payment in full of all debt owing as of May 3, 2004 and to terminate the financing arrangement, and that WFBC agreed to do so under certain conditions. That those conditions were satisfied is evidenced by the fact that WFBC charged, and received, its termination fee under Section 2.9(e). Here, the maximum line was $5 million, and the Debtors paid the loan off after September 5, 2003. Therefore, WFBC assessed against the Debtors a fee of $100,000. The Debtors paid that fee when they paid WFBC's claim in May, 2004. Therefore, the Court finds that the Agreement under which WFBC's claim arose terminated by its own terms and the actions of the parties in May, 2004.

Moreover, WFBC, in connection with the Debtors' objection to its claim, resisted the Debtors' attempt to dispute the termination fee. Recall that the Debtors initially objected to the reasonableness of WFBC's termination fee. WFBC vigorously defended its right to charge, and be paid, the termination fee. The Court agreed, preliminarily, with WFBC. Thereafter, the Debtors withdrew their objection to the reasonableness of the termination fee.

 Under Texas law, quasi-estoppel precludes a party from asserting a right inconsistent with a position previously taken, and applies when it "would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez v. Munoz, Hockema & Reed, LLP*, 22 S.W.3d 857, 863 (Tex.2000). It forbids a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects. *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236 (Tex.App.—Corpus Christi 1994).

 Accordingly, the Court finds as a matter of fact that the Agreement terminated when WFBC was paid in May, 2004, and concludes as a matter of law that WFBC is estopped from claiming otherwise. There is nothing in the Agreement which suggests that the obligation to reimburse WFBC for its attorneys' fees survives termination of the Agreement.[16]

For the same reason, WFBC's argument that as a creditor unimpaired by the Debtors' plan, its contractual rights passed through the bankruptcy cases and exist post-confirmation, gives it no comfort. While the Court agrees with WFBC's premise, its argument is fatally flawed on the facts, since its contractual right to recover attorneys' fees terminated prior to the dates for which it seeks fees in the Supplemental Application. The Court finds that WFBC's contractual rights indeed passed through the bankruptcy cases and survived confirmation, only to terminate three weeks later by the terms of the Agreement and the Payoff Letter.

 To the extent that WFBC is not relying upon section 506(b) as authority for the recovery of its fees, but rather is making a contractual argument premised upon

---

**16.** There is a provision in the loan documents which states that certain indemnity obligations survive termination of the Agreement. However, the absence of similar language in the attorneys' fees provision suggests that the parties never intended that obligation to survive the Agreement's termination.

the terms of the plan, the Court concludes that the plan does not provide for the payment of the fees sought in the Supplemental Application. Section 6.02 of the plan contemplated that WFBC would give the Debtors notice, prior to the closing of their exit financing, of the amount which WFBC claimed was owed to it under the pre-petition loan documents. The Debtors would pay that amount, and WFBC would release its liens once paid. The amount asserted by WFBC in its Payoff Letter would be the allowed amount of its secured claim unless the Debtors filed an objection within fifteen days of the closing on the exit financing. If the Debtors filed such an objection and the Court determined that WFBC was owed less than it had been paid, WFBC would disgorge the difference. The Payoff Letter, WFBC's notice of the amount due, says that WFBC agreed to terminate the Agreement upon payment in full of the amount owing *as of May 3, 2004.* It further states that upon payment of the amount owing *as of May 3, 2004* (defined as the "Payoff Amount"), the Debtors were authorized to file documents terminating WFBC's security interest. While it is true that the Payoff Letter provides for certain adjustments to be made thereafter, those adjustments, which could be for any reason, are to the "Payoff Amount," which is the amount owed as of May 3, 2004. There is simply no provision for any other adjustments, including those for attorneys' fees incurred after May 3, 2004.

Therefore, the Court concludes that the plan does not provide for the payment of post-confirmation reasonable attorneys' fees, and the Payoff Letter created no independent right to recover such attorneys' fees.[17]

## IV. CONCLUSION

For the reasons stated, WFBC is allowed $140,382.28 in fees and $2,253.63 of expenses with respect to its First Application, and nothing with respect to the Supplemental Application. The Debtors' objection to WFBC's claim is partially sustained as set forth herein.

**SO ORDERED.**

---

**17.** The Court therefore concludes that the Payoff Letter is somewhat of a red herring. The Court disagrees with WFBC that the permitted adjustments to the Payoff Amount were limited to administrative charges, because the letter refers to adjustments not only for some administrative charges, but also *for any other reason.* However, the Court agrees with WFBC that the Payoff Letter cannot logi-cally be construed in such a manner as to require WFBC to report, no later than July 9, 2004 all fees it incurred in defense of its claim. Rather, the Court finds that the Payoff Letter simply does not speak to what would happen if WFBC incurred fees beyond that date, and it neither creates nor impairs any other right WFBC may have to post-confirmation attorneys' fees.